(Decided 18th March, 1890.)

CHARLES C. PINCKNEY, JR. *vs.* DAMBMANN BROTHERS, AND COMPANY.

*Construction of Contract for the Sale of Goods—Extension of Time for Delivery—Evidence—Breach of Contract— Measure of Damages.*

On the 10th of June, 1886, D. Bros. & Co. purchased from P. 3000 tons of Dorchester Mine, S. C., rock phosphate at $5.50 per ton, delivered on board the buyers' vessels at Charleston, to be paid for in cash, or at buyers' option, by note at four months. And they agreed to remove the rock between the 1st of September, 1886, and the 30th of April, 1887. On the 24th of December, 1886, a second contract was made between the same parties for the purchase of "three cargoes" of the same phosphate, at $4.75 per ton, delivered on board the buyers' vessels at Charleston, to be paid for in cash, or at buyers' option, by note at four months; the "rock to be removed on completion of present contract, say between May and December, 1887." The 3000 tons purchased under the first contract was not all removed by the 30th of April, 1887. The purchasers subsequently sent their vessels to Charleston for the remainder of it, and the vendor loaded three of those vessels after that date, under said first contract, the last shipment under it being early in the month of May, 1888, and prior to the 9th day of that month. In an action by D. Bros. & Co. against P. to recover damages for his refusal to execute the second contract, it was HELD:

1st. That by the acts of both parties the execution of the first contract was extended far beyond the 30th of April, 1887.

2nd. That this extension carried with it an extension of the time for executing the second contract.

3rd. That P. having refused to perform the second contract, by a letter written after the date for delivery under that contract as extended had arrived, it became unnecessary for D. Bros. & Co. to send their vessels for the cargoes purchased by them under said contract.

4th. That the words "three cargoes," used to define the amount of phosphate sold under said contract, were not too indefinite, but could be explained by evidence showing the usual and customary capacity of vessels employed in that trade.

5th. That the damages recoverable for the breach of said contract was the difference between the contract price of the phosphate, and its market price at the place of delivery, after the 9th of May, 1888, that being the day on which, under the contract as extended, deliveries were to begin.

APPEAL from the Superior Court of Baltimore City.

The case is stated in the opinion of the Court.

*First Exception.*—The plaintiffs to sustain the issue on their part proved by Charles Glaser, one of the plaintiffs, that his firm had been dealing with the defendants since 1885, or possibly longer. The plaintiffs then asked Glaser the following question: Will you be kind enough to tell the Court, if you can, from your knowledge of the business and your knowledge of the communications with Pinckney, "what the average cargo is?" To the asking of this question the defendant objected, but the Court (HARLAN, J.) overruled the objection, and the defendant excepted.

*Second Exception.*—The plaintiffs prayed the Court to rule, as a matter of law, that upon a proper construction of the contracts and correspondence detailed in the agreed statement of facts, offered in evidence, the verdict must be for the plaintiffs for an amount equal to $1.25

Pinckney *vs.* Dambmann Bros. & Co.

per ton for such number of tons as the Court, sitting as a jury, from the evidence offered, may find should have been delivered under the contract executed the 24th of December, 1886. .

And the defendant offered the five prayers following:

1. The defendant asked the Court to rule that the uncontradicted facts in the agreed statement of facts, being—

First. A contract, dated the 10th of June, 1886, for the removal on the part of the plaintiffs of about 3000 tons of phosphate between the 1st of September, 1886, and the 30th of April, 1887.

Second. A contract, dated the 24th of December, 1886, for the removal of three cargoes of phosphate on the part of the plaintiffs, on completion of the contract of the 10th of June, 1886, between May and December, 1887.

Third. A failure on the part of the plaintiffs to remove all the phosphate named in the June contract, within the time therein specified.

. Fourth. A correspondence between the plaintiff and defendant, which resulted in a change in the time of delivery, the price and terms of payment of the balance of phosphate unremoved under the contract of the 10th of June, 1886.

Fifth. That said correspondence did not result in any change or modification of the contract of the 24th of December, 1886, but both plaintiff and defendant reserved all their rights thereunder.

The plaintiffs are not entitled to recover under this statement of facts, because the time in which the phosphate, under the December contract, was to be removed, having passed without its removal, and there being no waiver of the terms of this contract on the part of the defendant, or no renewal of further time to the plaintiffs to remove the same, the plaintiffs cannot now claim the

right to remove the same, or damages for the failure to allow them so to do.

2. The defendant prayed the Court to instruct the jury, that if they find from the evidence that the phosphate included in the June contract was to be removed by the plaintiffs within a specified time, viz., between the 1st of September, 1886, and the 30th of April, 1887, and the same was not so removed, and that the phosphate included in the December contract was to be removed on the completion of the June contract, viz., between May and December, 1887, and shall further find that the time for the removal of the phosphate, under the June contract, was changed by agreement between the plaintiffs and the defendant, without including a further agreement as to the delivery of the December contract, then the plaintiffs are not entitled to recover.

3. The defendant prayed the Court to instruct the jury, that if they find that the phosphate included in the June contract, was not removed within the time specified for its removal in said contract, and after such failure so to remove on the part of said plaintiffs there was no further or other agreement made as to the time of removal of the phosphate included in the December contract, the plaintiffs are not entitled to recover, notwithstanding the fact that they may find that the time for the removal of the phosphate under the June contract was extended by agreement between plaintiffs and defendant.

4. The defendant prayed the Court to instruct the jury, that the contract of the 24th of December, is void, for uncertainty in the quantity of rock to be removed, and the plaintiffs cannot recover thereunder.

5. The defendant prayed the Court to rule that there is no sufficient evidence from which the Court, sitting as a jury, can determine the number of tons contained in a cargo, with sufficient certainty to determine the amount due the plaintiffs, if it should find the plaintiffs are entitled to recover.

Pinckney *vs.* Dambmann Bros. & Co.

The plaintiffs specially excepted to defendant's first prayer, because—

1st. The facts stated as being uncontradicted, are improperly and imperfectly stated.

2d. That only some facts are stated, and others equally important are omitted, and the segregation is misleading.

The Court granted the plaintiffs' prayer and rejected the defendant's prayers.   The defendant excepted, and the verdict and judgment being against him, he appealed.

The cause was argued before ALVEY, C. J., ROBINSON, IRVING, FOWLER, and McSHERRY, J.

*Fielder C. Slingluff*, for the appellant.

*Wm. S. Bryan, Jr.*, and *Edgar H. Gans*, for the appellees.

McSHERRY, J., delivered the opinion of the Court.

On the tenth of June, 1886, the appellees purchased from the appellant three thousand tons of Dorchester mine, South Carolina, rock phosphate, at five dollars and fifty cents per ton, delivered on board the buyers' vessels at Charleston, to be paid for in cash, or, at buyers' option, by note at four months; and they agreed to·remove the rock between September the first, 1886, and April the thirtieth, 1887.   On the 24th of December, 1886, the appellees purchased from the appellant "three cargoes" of the same phosphate at four dollars and seventy-five cents per ton, delivered on board the buyers' vessels at Charleston, to be paid for in cash, or, at buyers' option by note at four months; the "rock to be removed on completion of present contract, say between May and December, 1887."   The second contract was not performed, and

the appellees claiming that the appellant had broken it, sued out a foreign attachment to recover the damages alleged to have been sustained by them. The appellant subsequently appeared, gave bond, by which the attachment was dissolved, and pleaded *non assumpsit* and never indebted. The trial resulted in a judgment against him, and he has taken this appeal.

The questions presented by the record may be reduced to four, viz., first, whether there was a breach of the contract of December 24, on the part of the appellant; secondly, assuming that there has been, whether that contract is sufficiently definite in its terms to support the pending action. The third relates to the admissibility of evidence, and the fourth was raised by way of objection to the instruction granted at the instance of the appellees.

In considering the first question, it becomes necessary to go somewhat fully into the facts, because upon them its solution mainly depends. It may, we think, be fairly inferred from the face of the two contracts, that it was the intention of both buyers and seller that deliveries under these agreements should not be made concurrently. The express terms of the second provided that the rock sold under it was to be removed upon the completion of the first, "say between May and December, 1887." The first contract distinctly limited the time within which the appellees were at liberty to send their vessels to Charleston for the phosphate; and the limit there fixed was April 30th, 1887. The appellees failed to remove all of the three thousand tons by that date. They subsequently sent their vessels to Charleston for the remainder of the three thousand tons, and the appellant loaded three of those vessels after the thirtieth of April, under the contract of June 10th, 1886. This was a waiver of the appellees' failure to remove the rock between September the first, 1886, and April the thirtieth,

1887. *Bollman vs. Burt,* 61 *Md.,* 415. The last shipment under that contract was on the —— day of May, 1888. The time for shipment under the first contract was accordingly, by both of the parties to it, as evidenced by their acts, extended far beyond April 30th, 1887.

It is now insisted that this extension of the time for the completion of the first contract deferred the period for demanding deliveries under the second, inasmuch as these deliveries were fixed to begin upon the completion of the first contract. Did, then, the extension of the first contract carry with it an extension of the second ? If no reference had been made in the second contract to the ending of the first, and if the limits named in the second be considered fixed and definite, then, undoubtedly, the terms "between May and December, 1887," excluded both *termini*—both May and December,—and the time for the performance of the second contract expired on and with the thirtieth of November, 1887. *Revere vs. Leonard,* 1 *Mass.,* 91; *Kendall vs. Kingsley,* 120 *Mass.,* 95. But the words, "rock to be removed on completion of present contract, *say* between May and December, 1887," do not imply in this case that the limits thus designated, between May and December were absolute; because the parties themselves have indicated that they did not intend those limits to be inflexible. *McConnell vs. Murphy,* *L. R.,* 5 *P. C. A.,* 203. Keeping in view the evident design of the buyers and seller when the contracts were made, that they were not to be executed concurrently, but in succession, there is little, if any, reason to doubt, when the correspondence between the parties is examined, what the mutual understanding of those parties was with respect to the meaning of the words imposing a limit for deliveries under the contract of December 24th, 1886. Without transcribing that correspondence, which began on November 10th, 1887, and ended on the 12th of May, 1888, it is sufficient at this point to say, that it had its

origin in an effort on the part of the appellees to secure lower prices than the rates named in the two contracts, in consideration of the surrender by the buyers of their option to settle by notes at four months. Throughout nearly the whole correspondence, both contracts are spoken of as outstanding or subsisting, though the time originally fixed for the completion of the first one had expired six and a half months before the letter of November the tenth, the beginning of the correspondence, was written. The parties failed to agree upon satisfactory terms as to cash settlements under both contracts, though they did agree as to the first one; and on December the second, *after* the expiration of the estimated limit named in the contract of December 24th, 1886, the appellees wrote to the appellant, and said: "Regarding the modification of the two existing contracts, we beg to state, that we decline to further discuss the matter; we will take the balance of first contract at your own figures, of $4.60 cash, and let the second contract stand on its own merits. When the time comes for the settlement of deliveries on account of the second contract, we will then, as it may suit us, pay cash or make use of the note option." To this the appellant, on December 5th, replied: "To come to practical matters, we will load your vessels at $4.60 cash on this contract, and as you so desire, will postpone the discussion of the other contract for the present." Here is a clear and distinct recognition of the fact that both contracts were then, according to the understanding of all the parties, subsisting and in force, even though the estimated limit named for the full completion of the last one had actually passed. If the appellant thought at that time, as he thinks now, that the second contract expired when the period between May and December had elapsed, and that the completion of the first had nothing to do with the performance of the second, it was his plain duty to

have said so in unambiguous terms. Manifestly, he ought not to have treated it as subsisting and outstanding, if he did not consider that it was so. And he could only have treated it as then subsisting by assuming that the period for its performance depended on the completion of the first agreement. It results, then, that the extension of the first contract, upon the completion of which the second was to begin, carried with it, in accordance with the expressed intention of the parties, as evidenced by the letters from which extracts have been quoted, an extension of the time when deliveries under the contract of December 24th were to begin.

This being so, the appellees, on February 21st, 1888, wrote to the appellant as follows: "We discussed our contracts with you some months ago, in strict connection with each other, and finally agreed to waive our right of optional cash or note, for balance of first contract, in consideration of your reduction of price to $4.60, and left the second contract unchanged on original terms, to take effect after expiration of the first contract, as stated in the body of the later one. * * * * Please, in order to avoid misunderstandings, state to us that you consider the contract of December 24th, 1886, in force as originally drawn, and oblige." The appellant replied on March 1st, before the last shipment under the contract of June 10th had been made: "Upon your motion a re-adjustment was had, in which you finally agreed to take two cargoes at a new price, upon new terms, one of which has been delivered, the other, I think now overdue, though I have not recurred to the dates. If convenient I would like you to take it. This I regarded as an end of all the contracts, and I do not now consider that there is any further engagement subsisting between us." This was a refusal on the part of the appellant to perform the contract of December 24th, but it was a refusal in advance of the period when deliveries under it were to

be made.   The appellees did not treat the contract as then rescinded.   Whether, if they had so treated it, they could have instituted suit at once as decided in *Hochster vs. De la Tour,* 2 *Ellis & Bl.,* 678, and *Frost vs. Knight, L. R.,* 7 *Exch.,* 111, it is not necessary to determine.   They treated the contract as still in force, for on May 9th, 1888, they wrote to the appellant: "With reference to contract dated December 24th, 1886, we presume that this contract still holds good for the three cargoes hot air dried land rock phosphate from 'Dorchester mine,' S. C., at $4.75 per ton 2240 lbs. f. o. b. buyers' vessel at Charleston City.   We would be pleased to have your opinion in this matter, and if you consider this contract not binding, your reasons for the same." Three days following the appellant replied: "This delivery completes the execution of all contracts in force and subsisting between us, as expressed in previous letters, to which I beg to refer you."   Here, then, was a refusal, after the date for delivery under the contract as extended had arrived, to perform that agreement, and, of course, it became unnecessary, as it would have been perfectly idle and useless, for the appellees to send their vessels for the cargoes purchased by them under the contract of December 24th.   2 *Benj. on Sales, sec.* 859. In consequence of this breach a right of action accrued to the appellees.

The second question presented is free from difficulty. The contract of December 24th, is alleged to be indefinite, because the *quantity* of phosphate sold under it is said to be uncertain.   The quantity is described as *"three cargoes."*   Generally speaking, a cargo means the entire load of the ship which carries it, and it may fairly be assumed that when one man undertakes to sell, and another to buy, a cargo, the subject-matter of the contract is to be the entire load of the vessel, *Borrowman vs. Drayton, L. R.,* 2 *Ex. Div.,* 15; reference being had to the

Pinckney *vs.* Dambmann Bros. & Co.

usual and customary capacity of the vessels employed in that trade.

It appears by the evidence set out in the second bill of exceptions, and elicited in response to the question contained in the first, that the vessels usually employed in this branch of trade between Charleston and Baltimore, carry about 800 to 850 tons. Some have a greater capacity, and some,—very few,—a less; but the figures just named represent the average. One witness stated that, if directed to procure a vessel for this trade for a single cargo, he would select one carrying about 825 tons, that being the average capacity of the "regular traders" running between Baltimore and Charleston. It is true there is some conflict in the record on this subject, but the Court below, sitting as a jury, found, as matter of fact from the evidence, that 840 tons made a cargo within the meaning of the contract. As the buyers' vessels were to be sent for the rock, it was the option of the appellees to fix the size of the cargo by selecting a boat of any suitable capacity. The breach of the contract by the appellant having absolved the appellees from the obligation to send any boat at all, they were entitled at the trial to fix the size of the cargo by other competent evidence, such as they did offer. The weight of that evidence was for the Judge, sitting as a jury, to pass upon. He has done that, and his finding is not open to review by us.

The only remaining question relates to the measure of damages. The instruction granted at the instance of the appellees is in the following words: "The plaintiff prays the Court to rule, as matter of law, that, upon a proper construction of the contracts and correspondence detailed in the agreed statement of facts, offered in evidence, the verdict must be for the plaintiffs for an amount equal to $1.25 per ton, for such number of tons as the Court, sitting as a jury, from the evidence

offered, may find should have been delivered under the contract executed December 24th, 1886.'' There was error in granting this instruction.

In such cases as this the measure of damages is ordinarily the difference between the contract price of the article sold and the market price at the *time* when and the *place* where they should have been delivered. *Williamson vs. Dillon,* 1 *Har. & G.,* 444; *Kribs vs. Jones,* 44 *Md.,* 396; *Shepherd vs. Hampton,* 3 *Wheat.,* 200; *Grand Tower Co. vs. Phillips,* 23 *Wall.,* 471; *Benj. on Sales, secs.* 1305 and 1118. If the vendor absolutely repudiates the contract before the time for delivery under it arrives, and the vendee elects to treat the contract as *then at an end,* yet, in considering the question of damages, they will still be estimated with reference to the period at which the contract ought to have been performed. *Josling vs. Irvine,* 6 *Hurl. & N.,* 512; *Brown vs. Muller,* *L. R.,* 7 *Exch.,* 319; *Roper vs. Johnson, L. R.,* 8 *C. P.,* 167; 1 *Chitty on Con.,* (11*th Am. Ed.,*) 621; *Mayne on Damages,* (*Wood's Ed.,*) *sec.* 206. In *Brown vs. Muller, supra,* the contract was for the delivery of 500 tons of iron, in about equal proportions, in September, October and November, 1871, and action was brought in December by the buyer. The defendant had given notice soon after the contract that he ''considered the matter off,'' and that he regarded the contract as cancelled, and had expunged the order from his books. It was held that the proper measure of damages was the sum of the difference between the contract and the market prices of one-third of 500 tons on the 30th of September, the 31st of October, and the 30th of November, respectively. The plaintiffs had not elected to consider the defendant's repudiation of the contract as a breach, but had insisted on the execution of the contract after that repudiation.

As already pointed out, precisely the same state of facts exists in the case at bar.

Pinckney *vs.* Dambmann Bros. & Co.

Now, deliveries under the first contract were not finished until early in May, 1888. The exact date does not appear, but it was certainly prior to the ninth. According to the contention of the appellees,—and we have stated that it is the correct one,—deliveries under the second contract were not to begin until those under the first had been completed. Therefore the time for deliveries to be made under the contract of December 24 began on May 9th, 1888. The suit was brought June 9th, 1888.

The instruction under review arbitrarily fixed a definite sum per ton as the measure of damages, without the slightest reference to *time* or *place*. That sum might mean the difference between the contract and the market price *before* breach, and at some other locality than the place of delivery. It should have confined the recovery to the difference between the contract and the market price after May 9th, 1888, and at the place of delivery. It did neither. There is evidence in the record that $1.25 was the difference between the contract and the market price on March 1st, 1888, and for twenty days before and after that date, and we presume the instruction was intended to point to that period. This was a period when the appellees were not entitled to the rock, as the first contract was still unfilled. Damages could not in this action be assessed as of that date. But whilst the record shows this difference in price on March the first it does not show whether that was the difference in Charleston, Baltimore or somewhere else, and the instruction is equally vague in this particular. Under it the appellees could recover $1.25 per ton without regard to the market price at the *date* for deliveries, and without reference to the *place* where $1.25 was the difference between the contract and the market price. Such is not the law, and the instruction was, in consequence, fatally defective.

The result of the views expressed in this opinion is that, in our judgment, there was no error committed by the Superior Court in its ruling set out in the first exception, admitting evidence tending to show the average number of tons making a cargo; but that there was error in granting the instruction asked by the appellees. The prayers presented by the appellant were properly rejected. They affirmed the direct converse of the conclusions we have reached, except as to the measure of damages, and upon that subject the appellant asked no instruction.

For the error indicated in granting the instruction contained in the second exception, the judgment must be reversed, and a new trial will be awarded.

*Judgment reversed, and*
*new trial awarded.*

(Decided 18th March, 1890.)