# ABUC TRADING AND SALES CORPORATION *v.* WILLIAM H. JENNINGS.

*Contract in Agent's Name—Liability of Principal—Surrounding Circumstances—Authority of Corporate Employee —Agency by Implication—Construction of Contract—Trade Meaning of Words Used.*

In passing upon prayers challenging the sufficiency of the evidence to justify a recovery, the evidence tending to support the plaintiff's case must be accepted as true.          pp. 398, 404

In an action against the "A Trading and Sales Corporation," a New York corporation, on a contract in the name of B, described as vice-president and general manager of the "A Trading Company of New York," who signed it in his own name as "party of the first part," the contract providing for payment of commissions on sales of metal taken from vessels, "destroyers," bought for scrapping purposes and located at a certain point, *held* that there was evidence to go to the jury that the contract was intended as the contract of defendant and not of B, it appearing that defendant, and not B, owned the destroyers, and that B, while not defendant's vice-president and general manager, was its superintendent of scrapping operations, and as such had been allowed to sign other contracts for defendant.
                                                            pp. 404-405

Where the text of a written contract, considered in connection with its subject-matter, leaves it in doubt whether it was intended to bind the principal or the agent who signed it, it is proper to consider the situation of the parties, the circumstances under which the contract was made, and such other matters as will directly reflect upon the intention of the parties.          p. 405

One appointed by a corporation superintendent of its plant for scrapping vessels, but who, in connection with that plant, and with the consent of one who was vice-president and sole acting director of the corporation, exercised the powers and duties of a general manager, including the negotiation and exe-

cution of the lease of the plant, contracting for the towage of the vessels to the plant, the purchase of additional equipment, and the sale of ferrous metals from the vessels, *held* not, as a matter of law, to be without authority to agree to pay commissions for procuring purchasers for the non-ferrous metals from the vessels.                                  pp. 412, 413

Notice to one who was vice-president and sole acting director of a corporation, and "had full authority" in managing its affairs, was notice to the corporation.            p. 409

A general agent is one who is empowered to transact all the business of his principal of a particular kind or in a particular place, and the term may be equivalent to that of general manager.                                        p. 10

Where an agency arises by implication from acts and conduct indicating an intent to create it, the acts and conduct of the principal from which it is inferred need not be known to the person seeking to charge the principal, the agency in such case not being based on estoppel.                p. 411

On an issue as to the authority of defendant's agent to make the contract in suit, where such alleged authority was based on an inference from certain facts, it was error to refuse a prayer that plaintiff could not recover unless such agent had "actual" authority to make the contract, or defendant held him out as having such authority, the word "actual" referring to the existence of the agency and not to the proof of it, and an agency inferred from facts being "actual" to the same extent as one created by express words.                            p. 413

In an action on a contract to pay commissions on all the copper and lead recovered from certain vessels when scrapped, in consideration of plaintiff's producing one who would buy all the scrap copper and lead from such vessels, defendant's prayer limiting damages to the scrap copper "delivered" to the buyer procured by plaintiff was properly refused.       p. 414

It was, in such case, error to grant plaintiff's prayer which allowed commissions on all the non-ferrous metals from such vessel sold to such buyer, there being non-ferrous metals other than copper and lead, and the question whether the parties intended that commissions be allowed on all non-ferrous metals so sold being at most a question of fact for the jury.
                                        pp. 414, 415

If words have locally a meaning different from that commonly or generally given them, and were so understood by the parties to a contract in using them therein, the local meaning will be accepted as controlling, and by local meaning is meant that which is peculiar to a locality, a trade, a profession, and the like. pp. 415, 416

In an action on a contract to pay commissions on the sale of scrap copper, evidence was admissible that in the metal trade the term scrap copper included all metals in which copper appears as the basic element. p. 416

*Decided November 10th, 1926.*

Appeal from the Circuit Court for Baltimore County (DUNCAN, J.).

Action by William H. Jennings against the Abuc Trading and Sales Corporation. From a judgment for plaintiff, defendant appeals. *Reversed.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Edgar Allan Poe* and *Carl R. McKenrick,* with whom were *C. Gus Grason* and *Bartlett, Poe & Claggett* on the brief, for the appellant.

*William D. Macmillan,* with whom was *Jesse N. Bowen* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

James L. Bernard, who appears to have been at that time engaged in the business of scrapping or dismantling obsolete and disused ships, in the latter part of 1924 interested Louis Starr and John J. Lyons in the purchase of a ship, the Morganza, then lying in the James River. Later, he with Lyons and Starr, went to the offices of Ben Barber, Esq., an attorney with offices in New York City, and informed him that he had purchased a ship for the purpose of scrapping it, and that they needed a corporation to carry on a business of that character. Barber told them that he "had a corporation in the office" which could be organized

immediately, and they instructed him to organize it. Thereupon the Abuc Trading and Sales Corporation, a corporation of the State of New York, which had been incorporated in 1923, was "pressed into service" for the venture. Fifty-one per cent. of the stock was issued to Starr, who was to supply the money for the venture, and forty-nine per cent. to John J. Lyons, who agreed to divide fifty per cent. of his stock with Bernard. Upon the organization of the company, William J. Lyons, a brother of John J. Lyons, was elected president, E. G. Graeber, vice-president and treasurer, and Frank V. Donegan, connected with Barber's office, secretary, and they appear to have also composed its board of directors. At the first meeting of the directors it was resolved that the funds of the corporation should be deposited in the National Bank of Baltimore, subject to checks made in the corporate name and signed by the treasurer, that its principal office should be in the Times Building, New York City, and that

> "Mr. James L. Bernard be and he is hereby appointed superintendent of the Sparrows Point plant of the Bethlehem Shipbuilding Corporation or such other plant that the corporation might procure for the purpose of scrapping vessels, at the salary of $75.00 per week, payable weekly, and that said salary shall be paid at that rate from the 24th day of October, 1924."

It was further resolved:

> "That the president or vice-president be and he hereby is authorized to enter into any agreement which he in his judgment deems to be fair and reasonable with the Bethlehem Shipbuilding Corporation covering a lease of the Sparrows Point plant of that corporation for the purpose of scrapping ships; and * * * That he be and hereby is authorized to enter into contracts for the purchase of ships and other materials for scrapping, and tools and other equipment to carry out said scrapping operations and all other contracts necessary to carry on said business."

Bernard then bought the Morganza for the company, and leased plant equipment at Sparrows Point, Maryland, from the Bethlehem Steel Company, for wrecking it. Subsequently on behalf of the company he negotiated the purchase of four other ships, described as "destroyers," lying at New London, Connecticut, for $33,000, had them towed to Sparrows Point, and leased additional space for wrecking or scrapping them. The four "destroyers" were steel ships, but in their construction, in addition to ferrous metals such as iron and steel, it was thought that a quantity of non-ferrous metals, such as lead, copper, brass, and other metals in which copper appeared as a basic element, were used.

In December, 1924, Bernard, representing himself to be the agent of the appellant, made a written contract with William Henry Jennings, sales manager of the American Steel & Wire Company, which reads as follows:

"Baltimore, Md., December 24th, 1924.

"The agreement hereinafter stipulated has this date been made between James L. Bernard, vice-president and general manager of the Abuc Trading Company of New York, party of the first part; and Wm. H. Jennings of Baltimore, Md., party of the second part; and witnesseth:

"That the party of the first part is occupied in wrecking for scrap metals, four ships known as "destroyers," recently bought and now placed for wrecking at the ship building plant of the Bethlehem Steel Company, at Sparrows Point, Md., and that the said party of the first part is desirous of finding purchasers for the non-ferrous metals obtained in the scrapping of said vessels.

"It is therefore agreed by the parties herein mentioned, that the party of the first part will pay to the party of the second part, a commission of one-half cent per pound, on the entire tonnage of scrap lead and scrap copper recovered from said vessels, in consideration of the fulfillment of agreement by the party of the second part of introducing party of the first part to responsible buyers financially who will buy this

entire tonnage of lead and copper scrap from the party
of the first part, as fast as such metal scrap is recov-
ered from said vessels and ready for delivery to such
buyers. All such above purchases to be made at prices
satisfactory to said party of the first part.

"It is further agreed that such commissions due to
the party of the second part shall be paid from time
to time, immediately after party of the first part has
received full payment for each and every shipment to
such buyers.

"Signed by party of the first part—

"James L. Bernard.

"Signed by party of the second part—

"Wm. H. Jennings."

Thereafter Jennings introduced to Bernard a purchaser,
which bought and paid for from the appellant 430,939 pounds
of non-ferrous metal taken from the four destroyers. Jen-
nings thereupon demanded that the appellant pay him his
commission of one-half cent per pound on the material so
sold, and upon its refusal to make such payment, he instituted
attachment proceedings on original process as against a
non-resident against it. The attachment was laid upon
three of the destroyers and a quantity of brass scrap. The
defendant appeared in the short note case, filed the general
issue pleas therein, filed a bond, dissolved the attachment,
and the case then proceeded to trial on the short note case.
That trial resulted in a verdict and judgment for the plain-
tiff, and from that judgment this appeal has been taken.

At the conclusion of the whole case the plaintiff offered
three prayers, of which the court granted one, amended and
granted one, and refused the other, and the defendant offered
seven, of which two were granted and the others refused.
These rulings are the subject of the second exception, and
they all rest upon one or more of these propositions, (1)
that the contract, which is the basis of this suit, was the con-
tract of the Abuc Trading and Sales Corporation, (2) that
James L. Bernard was duly authorized as the agent of the
appellant to execute that contract, (3) that the term "scrap

copper" used in the contract, was equivalent to and meant the same thing as "non-ferrous" metals, and (4) that the plaintiff was entitled to commissions, not only upon metal taken from the four destroyers actually sold to the purchaser introduced by him, but also upon all such metal which the appellant agreed to sell to that purchsaer, but which was not in fact actually sold to it.

Before dealing with the legal principles involved in these propositions, we will refer to the evidence relating to them, and since the defendant's first and fifth prayers challenge the legal sufficiency of that evidence, we will, under the established rule, for the purposes of those prayers, assume the truth of all facts shown by it, together with all inferences which may properly and naturally be drawn therefrom, which tend to support the plaintiff's claim. Thus dealt with, the evidence establishes these facts:

The Abuc Trading & Sales Corporation is, as we have stated, a corporation of the State of New York, organized apparently for the sole purpose of buying obsolete and disused ships, scrapping them, and selling the "scrap" metal contained in them. Its "principal office" was, by a resolution of its board of directors, located in the Times Building at 42nd Street and Broadway in New York City, but it also had an office on the property of the Bethlehem Shipbuilding Company at Sparrows Point, where some of its mail was received, where some of its books were kept, and where Mr. E. G. Graeber, its vice-president and treasurer, who kept its books, appears to have had his headquarters. William J. Lyons, president of the corporation, and Frank V. Donegan, its secretary, although duly elected by the board of directors, had actually nothing at all to do with the business or management of the company, but it was carried on by E. G. Graeber, under the direction of John J. Lyons and Louis Starr, who, together owned all of its stock, but held no office in it. Graeber himself, offered as a witness for the appellant, testified that he "had full authority in taking charge of the Abuc Company from start to finish," and later said that he controlled the board of directors, and that he in fact was the

board of directors. Bernard was not a stockholder of record, although John J. Lyons had agreed to divide his stock with him, nor was he an officer, but he had been appointed "superintendent" of the company's plant at Sparrows Point, and appears to have been the only person connected with the management of the corporation who had had previous practical experience in the business in which it was engaged. He negotiated contracts for the purchase of the "Morganza" and the four "destroyers," for leasing space for docking and wrecking them. With the consent and knowledge of Graeber he made and signed contracts in the name of the company for the sale of the scrap steel and other ferrous metals taken from the "destroyers," he also with the knowledge and consent of Graeber executed in the name of the company the contract under which it leased space from the Bethlehem Shipbuilding Company, he made contracts for towing the ships to Sparrows Point, employed and paid the men employed in wrecking them, and purchased or leased the machinery and appliances used in that work, and he sold most of the scrap taken from the destroyers, as "that was one of his duties."

Early in the fall of 1924, Bernard approached William H. Jennings, who was sales manager of the American Steel and Wire Company, who was familiar with the metal trade and knew many persons engaged in it, and asked him to introduce him, Bernard, to the "Bethlehem people," which he did. Later, in the early part of December, Bernard again came to him, and told him that he knew of an opportunity to purchase four "destroyers" and added: "This is big game, these boats are solid metal, copper and steel, etc. I can't handle them the way I have been handling this boat at Norfolk and I will have to make arrangements with very large concerns to take this stuff. * * * you know these big people around the city and if you can make a date to introduce me to some one who will buy all the non-ferrous metal off these destroyers what I can handle off them, because I know Leury Brothers, who as I knew were the very largest steel scrap people in the country, I mean handling the steel through the Bethlehem

Steel Company, but I don't know anybody who will buy this non-ferrous metal in large quantities." Jennings did not then know of any one who would purchase the scrap, but first offered it to his own company, and when it was unable to take it, he finally interested Mr. Leon Falk, Sr., of the Federated Metals Corporation of Pittsburgh, in it, and arranged a meeting between Falk and Bernard. As a result of that meeting, the Federated Metals Company contracted with the appellee to purchase certain quantities of the non-ferrous metals from the four destroyers, and under that contract 430,939 pounds of such metal were actually sold, delivered, and paid for. Prior to the meeting between Falk and Bernard, Bernard had orally agreed with Jennings to pay him one-half cent a pound commission on sales of "copper scrap" to purchasers introduced by him, and on the day when Falk met Bernard in Baltimore, that agreement was put in writing, and signed by Jennings and Bernard. The contract for the sale of the non-ferrous metal in the four destroyers was formally executed by the Federated Metals Company, and the appellant, through James L. Bernard, on December 30th, 1924.

Bernard, testifying for the appellee, when asked whether Graeber knew of these contracts with Jennings and the Federated Metals Company, gave this testimony: "How did they get on file in the office? I took them there. Which office? Sparrows Point office. When? The day after they were signed. That would be December 31st, 1924? Yes, and the next day just before New Year's; it was signed that night, I don't know whether I took them down that night or the day afterwards; I took them down and put them on file. * * * Where did you put them? I don't know; we didn't have very much space to put anything, we only had a little desk about that big (indicating) and letter file and stand and most everything went on that desk. Any officer of the company there at that time? Mr. Graeber. Did he see these two agreements? Yes. The agreement with the Federated Metals and the agreement with Mr. Jennings? Yes. That was either December 31st, 1924, or January 1st, 1925. Within a

day or so of signing of that contract. How do you know that Mr. Graeber saw those two contracts? Well, he was in charge of the office, and he filed all the papers away, and they were there on the desk, and I had discussed the contract with him the day after Mr. Falk and Mr. Simon were down there. Why are you positive he knew anything at all about the Jennings contract? Well, it was the day after they were there, the day I brought the contract back, within a short period of time after I had the contract signed, I think the next day; I told him we made a good contract with the Federated Metals and he said, 'Yes,' and I said, 'We got more than the market,' and I said, 'Including Jennings' commissions that nets us so much money.' He said, 'Yes,' and I think a man named Patten was there at the time and discussed it at lunch time, that the contract was made, and said, 'I understand they are very big people and have a good reputation,' and after the shipment was made I gave an office memorandum to him to pay Mr. Jennings his commissions."

The first shipment of non-ferrous to the Federated Metals Company under this contract appears to have been made on or about January 16th, 1925, and on February 6th Bernard gave to Jennings a memorandum which indicated that there was due him, as commissions on the first shipment, $219.52. On the day that a check paying for the first shipment of scrap metal was received from the Federated Metals Company, Bernard gave a memorandum of the amount of commissions due Jennings to Graeber, and instructed him to pay it. Graeber, instead of doing that, called up Louis Starr, who was a stockholder of the corporation, for instructions, and was told by him not to pay it. Shortly after that Jennings inquired of Bernard about his commissions, and Bernard then learned for the first time that Graeber had not paid them. He then asked Graeber why they had not been paid, and Graeber told him that he understood the commissions were to be one-quarter of a cent a pound, and also told him that he had consulted Starr, who told him not to pay it. Bernard then had an interview with a "Mr. Lyons," presumably the stockholder, and not the president of the corpo-

ration, and he consented to the payment of Jennings' commissions. Shipments continued to be made to the Federated Metals Company, but no payment on account of his commissions was made to Jennings, and on March 2, 1925, Bernard sent a memorandum for "Mr. Lyons" to Ben Barber, Esq., the company's attorney in New York, stating that 153,090 pounds of metal had been settled for by the Federated Metals Company, that Jennings had "received no payments" and that Graeber would not make any until authorized by Starr, and requesting that such authority be given, so that "payment can be made as agreed." That memorandum was never delivered by Barber to Lyons, but on February 11th, 1925, the appellant by its treasurer had written to the Federated Metals Company a letter which in part reads as follows: "Our Mr. Bernard has brought to us a question of one-half cent a pound commission to be paid to Mr. W. H. Jennings and it is the desire of the directors of this corporation to ascertain from you whether the said Mr. Jennings is an authorized broker. If this is the case it is the sincere wish of this corporation to so recognize Mr. Jennings and pay him the above commission on all shipments made to your good firm." The Federated Metals Company, replying to that letter, in part said: "Since all of our discussions and trading on this subject have been with Mr. Bernard, we respectfully refer you to him for information pertaining to our contract. It is necessary for us, however, to say that if we had not been referred to Mr. Jennings, the likelihood is that we would never have consummated this transaction." Graeber, in explaining his reference to the "directors of this corporation" in his letter to the Federated Metals Company, said that there had been no meeting of the directors, but that he was the board of directors and when the question of commissions came up to him it came up to the board of directors. After writing the letter of February 11th, 1925, the appellant made six more shipments, the last of which was on April 15th, 1925, to the Federated Metals Company, of non-ferrous metals, which, with the three shipments previously made, aggregated 430,939 pounds. After that date it sold and

shipped to the Globe Iron Works the balance of the non-ferrous metals taken from the destroyers, 137,393 pounds, although the Federated Metals Company was ready, able and willing to accept that also under its contract with the appellant.

During the course of the trial, a question arose as to what was meant by the term "scrap copper" as used in the contract between the parties to this appeal, and in connection with that issue it was testified by the appellee, who had had a lifetime experience in dealing with copper and brass, that "the classification for all of these alloyed or compounded metals which depend upon copper for their base is in the trade known as copper, as there can be, of course, solid copper without any brass or other compound, while there can never be brass or bronze, for instance, without a great percentage of copper, so that, in classifying the metals on these boats, the expression copper metals was, from habit in the trade and with full understanding of both parties, intended to cover all the metals which contained any percentage of copper, without designating any particular metals as showing certain percentage of the copper base." To the same effect was the testimony of Bernard who, in speaking of certain valves made of an alloy on a copper base, said: "You mean if you are talking about these valves, you would talk about them as copper valves? A. According to the composition that is in them; in the terms of the seller they are brass, and in the terms of the manufacturer, they are copper. * * *" "Q. What do you mean, what distinguishes these valves. You mean in the terms of the manufacturer they are copper, but in the terms of the dealer they are brass. What do you mean? A. That is the way they are. * * * You tell the court that was copper and not brass? A. I am trying to hold down the basic metal. Q. You have told us the basic metal was copper? A. Yes. Q. Then, if you go by the basic metal, it is all copper? A. It is all copper, it is basic metal."

These facts have been, for brevity, stated in narrative form, for although many of them are flatly contradicted by

the appellant, nevertheless, in considering its first and fifth prayers, the evidence tending to support them must be accepted as true. Turning now to a consideration of those two prayers, we find that the first prayer of the appellant is a demurrer to the evidence in common form, while its fifth prayer in effect asserts that there is no evidence in the case legally sufficient to warrant the inference that, in executing the contract with Jennings, Bernard acted as the agent of the appellant, or that the appellant, with full knowledge of all facts material and relevant to the transaction, ratified his act. *Mechem on Agency,* pars. 393-396; *Martin v. Lanahan & Co.,* 133 Md. 531.

The first question presented by these two prayers is whether there is to be found in the record any evidence legally sufficient to support the hypothesis that the contract sued on is in fact the contract of the appellant. The language of the contract itself, considered apart from its subject matter, while not wholly free from ambiguity, yet is so clear that, if we are not at liberty to go beyond its text to ascertain its meaning, it would be difficult indeed to hold that it is the contract of the appellant. It states that it is between "James L. Bernard, vice president and general manager of the Abuc Trading Company of New York as party of the first part," and William H. Jennings, and it is signed by "party of the first part—James L. Bernard" and by Jennings. That is, in so many words, it does not purport to be the act of the "Abuc Trading and Sales Corporation" but the act of James L. Bernard, who described himself as the vice president and general manager of the "Abuc Trading Company of New York," and it was not signed by Bernard on behalf of any corporation, but by him as "party of the first part," who is described in the contract as "James L. Bernard, vice president and general manager of the Abuc Trading Company of New York." But if it is so construed, the contract is utterly meaningless and ineffective, because Bernard as an individual had no interest in the four destroyers, and there was no such corporation as the "Abuc Trading Company of New York." On the

other hand, there was a corporation having the name of the "Abuc Trading and Sales Corporation," which was of New York, which did own the four destroyers referred to in the contract, and while Bernard was not the vice president of that corporation, he was its general superintendent, and had been permitted by and with its consent to execute contracts in its name, and Mr. Graeber who, according to his own testimony, was not only the vice president and treasurer of the corporation, but also functioned as its board of directors, knew that Bernard represented himself as its general manager and vice president, and when asked whether Bernard had not signed contracts for the company, he gave this testimony: "Signed by you? A. No. Q. Signed by Bernard? A. Yes. I let him sign them. He had a peculiar hobby about signing the papers, so he wanted to retain his prestige as a scrap steel man. Q. That prestige would be retained by signing as vice-president and general manager? A. Yes, I think he felt that way about it. Q. It was an unusual thing? A. Not necessarily. Q. You let him go ahead, you didn't make any objection, you didn't care whether he signed? A. Oh, yes, I knew every contract he signed and I had copies of the contracts at the time they were signed." And where, as is the case here, the text of the written contract, considered in connection with its subject matter, leaves it in doubt whether it was intended to bind the principal or the agent, we are not limited to the letter of the instrument, but may also consider the situation of the parties, the circumstances under which it was made, and such other extrinsic matters as will directly reflect upon the intention of the parties. A contract can not well be considered apart from the subject matter upon which it operates. *Mechem on Agency* (2nd Ed.), par. 1166 *et seq.,* 1176. And where the very nature of its subject matter makes its language ambiguous and its meaning doubtful, it is permissible to resort to a consideration of such facts, as the situation of the parties and the attendant circumstances, as will be actually helpful in determining what the parties to the contract really meant by what they said.

In *Merriam v. United States,* 107 U. S. 437, the Supreme Court said: "It is a fundamental rule that in the construction of contracts the courts may look, not only to the language employed, but to the subject matter and the surrounding circumstances, and may avail themselves of the same light which the parties possessed when the contract was made." That statement of the rule was cited with approval in *Ess-Arr Knitting Mills v. Fischer,* 132 Md. 8, but in *Fidelity & Deposit Co., etc. v. Thomas,* 133 Md. 275, this Court, in referring to that rule, said: "We have not thought it necessary to speak of the cases referred to by the appellant to the effect that, in construing a written contract, the court will look to the language employed, the subject matter and the surrounding circumstances to ascertain the intention of the parties. In our judgment the language of this contract is too clear to have any doubt about the intention of the parties." In *Buffalo Steel Company v. Kirwan,* 138 Md. 66, the Court, after referring to the same rule as stated in *Bond v. Humbird,* 118 Md. 658, and *Phoenix Pad Mfg. Co. v. Roth,* 127 Md. 543, followed the decision in *Fidelity & Deposit Co. v. Thomas, supra,* and said: "These principles are only applicable in cases where there is some ambiguity or doubt inherent in the language of the contract in the connection in which it is used, but where the language of the contract is clear, free from ambiguity or doubt, and complete, there is no need for construction and it will not be resorted to." The appearance of a conflict in those cases is wholly illusory, and disappears at once when it is considered that, in formulating these apparently conflicting rules, courts were affected, according to the varying nature of the cases in which they were stated, by varying "standards of interpretation." Wigmore, who originated that phrase, in his work on evidence, distinguishes four possible "standards of interpretation," which may be applied to the interpretation of contracts, which he classifies as follows: "The standard of the community, or popular standard, meaning the common and normal sense

of words; the local standard, including the special usage of a religious sect, a body of traders, an alien population, or a local dialect; the mutual standard, covering those meanings which are peculiar to both or all the parties to a transaction, but shared in common by them; and the individual standard of one party to an act, as different from that of the other party or parties, if any." *Wigmore on Evidence,* par. 2461. And to these Williston adds a fifth, which he defines as follows: "A slightly different further standard may, however, be supposed for a bilateral transaction. This standard is the sense in which the party using the words should reasonably have apprehended that they would be understood by the other party."

When contracts are interpreted according to the "local" standard, in order to ascertain their true meaning, it is necessary to consider the surrounding circumstances in so far as they tend to show the local meaning of the language of the contract, and this may be done (*Williston, Contracts,* par. 629), but where the normal standard of interpretation is applicable, such circumstances cannot be considered unless the language of the contract is inherently ambiguous because of obscurity in its text, or in the application of its text to its subject matter (*Ibid.*), and that principle is very clearly stated by Judge Hand in *Eustis Mining Co. v. Beer,* 239 Fed. 985, where he says: "The admissibility of the general surroundings in which the contract was written (*Merriam v. United States,* 107 U. S. 437, 441, 2 Sup. Ct. 536, 27 L. Ed. 531) rests upon quite a different basis, one which can be said with a nearer approach to accuracy to turn upon the ambiguity of the written words. All the attendant facts constituting the setting of a contract are admissible, so long as they are helpful; the extent of their assistance depends upon the different meanings which the language itself will let in. Hence we may say, truly perhaps, that if the language is not ambiguous, no evidence is admissible, meaning no more than that it could not control the sense, if we did let it in; indeed, it might "contradict"

the contract—that is, the actual words should be remembered to have a higher probative value, when explicit, than can safely be drawn by inference from surroundings. Yet, as all language will bear some different meanings, some evidence is always admissible; the line of exclusion depends on how far the words will stretch, and how alien is the intent they are asked to include."

Now, while the language of the contract in issue here, if read literally and without reference to anything outside of its four corners, may be clear enough, yet when considered in connection with its subject-matter, its literal meaning appears at once to be wholly absurd and inapplicable to the matter upon which the parties intended it to operate. The subject matter of the contract was the sale of certain scrap metals to be taken from four destroyers owned by the appellant. Bernard could not sell that metal for himself, he could only sell it for the owner, his employer, Jennings knew that Bernard did not own the material, and he knew, too, that he professed to be acting for the owner. Nor is it reasonable to assume that Bernard, whose only interest in the appellant's business was that of an employee, receiving a salary of seventy-five dollars a week, with a possible interest in about one-fourth of its stock, intended individually to pay the commission on sales made for the benefit of the corporation, of which he might receive no part. Nor is it credible that he and Jennings would enter into a contract on behalf of an imaginary corporation which had no interest whatever in its subject matter. On the other hand, it is obvious that what they intended to do was to execute a contract between the appellant and Jennings, under which Jennings was for a stated compensation to procure a purchaser for certain materials owned by the appellant, and Bernard must, in determining the questions submitted by the two prayers under consideration, be taken to have executed the contract for and on behalf of the appellant. *Post v. Pearson,* 108 U. S. 418.

The next question is whether Bernard was authorized, either expressly or by implication, to execute the contract for

the appellant. The record discloses no evidence legally sufficient to warrant the inference that he was expressly authorized to execute it, and his authority to do that, if it existed, must be inferred from the nature and character of his conduct and duties in connection with the business in which the appellant was engaged at the time the contract was made. And in connection with that inquiry it is material to consider the unusual situation and authority of E. G. Graeber in his relation to the corporation, as well as the manner in which the corporation exercised its corporate functions. Because whatever the New York officers of the corporation knew or did not know of Bernard's activities and conduct in connection with its business, Graeber at least either knew or was in a position to know of them. At the first directors' meeting of the corporation, held October 30th, 1924, the three incorporating directors resigned, and Messrs. Lyons, Graeber and Donegan were "appointed" in place of them. These three gentlemen then elected William J. Lyons president, E. G. Graeber vice-president and treasurer, and Frank V. Donegan secretary. Mr. Lyons' position, to quote Mr. Graeber was "just an honorary president's job, and from that time on he took no further interest in the corporation, and had nothing to do with its management." On December 24th, Mr. Graeber and Mr. Donegan held a second, and apparently the last, directors' meeting of the corporation, at which meeting Mr. Graeber acted as chairman and Mr. Donegan as secretary, and from that time Mr. Donegan also became quiescent. From the date of that meeting, no director or executive officer of the corporation except Graeber had anything to do with its management, and he alone, to quote again from his testimony, which was not contradicted, "had full authority in taking charge of the Abuc Company from start to finish." Under such circumstances notice to him was notice to the corporation, and his knowledge was its knowledge. *Cook on Corporations,* par. 727; *Sun Printing and Pub. Co.,* 183 U. S. 650, 14 A. C. J. 354. So that it will be assumed that what notice or knowledge Graeber had of the conduct and

activities of Bernard in connection with the business of the corporation must also be imputed to the corporation itself. Bernard, as has been stated, was, by the directors of the corporation, at their meeting of October 30th, 1924, appointed superintendent of the plant at Sparrows Point, but in connection with the appellant's business at that place he actually exercised the powers and duties incident to the office of general or managing agent. That is to say, he negotiated the purchase of all of its property referred to in the record, he negotiated and executed in its name the lease of the space and facilities for scrapping the ships which the company owned, he contracted for towing the ships to Baltimore, and agreed upon the price for that service, he contracted for the gas and air equipment employed in scrapping the ships at a cost of ten thousand dollars, he employed and discharged the company's employees, he negotiated and executed contracts for the sale of the ferrous metals taken from the four destroyers, and for the sale of all metals taken from the Morganza, and he negotiated and executed on behalf of the corporation the contract under which it agreed to sell designated quantities of the non-ferrous metals in the four destroyers to the Federated Metals Company. It is not clear what a general agent or general manager could have done in connection with the appellant's business at Sparrows Point which was not done by Bernard, with its acquiescence and apparent consent. A general agent has been said to be one who is empowered to transact all "the business of his principal of a particular kind or in a particular place" (4 *Words and Phrases,* 3084), and may be equivalent to the term "general manager." *Atlantic and Pacific R. Co. v. Reisner,* 18 Kan. 458. And that definition in substance appears to have been generally accepted. And the evidence is in our opinion sufficient to support the inference that the appellant intended that Bernard should act as its general or managing agent in the business of scrapping the four destroyers, and in disposing of the scrap metal taken therefrom, within the meaning of that definition, even though all the facts from which that

inference is drawn were not known to Jennings. For such
an agency may arise by implication from acts and conduct
indicating an intent to create it, as well as from an express
appointment, and where it is thus created, the acts and con-
duct of the principal from which it is inferred need not
necessarily be known to the person seeking to charge the prin-
cipal, because in such a case the agency is one in fact, and
not an agency by estoppel. And while an agency by estoppel
cannot be relied upon to establish a claim against the prin-
cipal sought to be bound, unless the acts and conduct of the
principal which justified the inference of agency were known
to and relied upon by the claimant, that is not true where
the agency is one in fact, even though arising by implica-
tion from the conduct of the principal. That distinction is
clearly and we think accurately stated in 31 *Cyc.* 1219. And
Mechem, after pointing out that, "so far as powers depend
upon what is usual or necessary in special cases, and so far
as they are regarded as incidental to the main authority
conferred, because that is the regular and ordinary way of
doing the business, they do not rest upon any doctrine of
estoppel, but are inferences of fact tracing their origin to
the same source as the main power itself. * * * When, how-
ever, the authority is not one included within the foregoing
categories, but is one sought to be deduced from special
circumstances of recognition, acquiescence, or holding out,
the principle of estoppel or something akin to it at least,
must be invoked," said: "The chief practical difference be-
tween the two cases is found in the fact that in the former
it is not essential that the person seeking to enforce the au-
thority should actually have known and relied upon the cir-
cumstances from which the inference of authority in fact is
based (any more than it is essential in any case of authority
that the person who ultimately seeks to enforce it shall have
relied upon it at the time as, for example, in the case of an
undisclosed principal), while in the latter case it is the
essence of his complaint that he was led by the circumstances
in question to rely upon the existence of the authority, and

proof of his knowledge and reliance upon them must be made." *Mechem on Agency,* par. 722. In *Murphy v. Cane,* 82 N. J. L. 557, the president of the Cane Company had made a contract for installing the plumbing in a school building. In a suit brought on that contract it was contended that he had no authority to make the contract. In dealing with that contention, Chancellor Pitney, after holding that the evidence was sufficient to show that the course of business of the company indicated an intention to confer upon the president such authority as he customarily exercised, and after quoting a statement of Mr. Justice Depue in *Stokes v. New Jersey Pottery Co.,* 46 N. J. L. 242, that "there are cases in which the powers of an officer of a corporation, and his authority to act for the company, are enlarged beyond those powers which are inherent in his office; but those are cases in which the agency of the officer has arisen from the assent of the directors, presumed from their consent and acquiescence in permitting the officer to assume the control and direction of the business of the company," said: "It is not correct, we think, to confine the application of this doctrine to cases of strict estoppel. At least where a third party seeks to charge a corporation with a contract made by it through the agency of one of its officers, it is not incumbent on such third party to show that the previous course of business was known to and relied upon by him."

Assuming that Bernard was the managing or general agent of the appellant in connection with its business at Sparrows Point, the next question is, Had he the authority to bind his principal by the contract with Jennings? Counsel for the appellant contends very earnestly and forcibly that he had no such power, because he was at most a mere selling agent and could not bind his principal to employ and pay another for that which he himself was paid to do, and he cites *Brager v. Levy,* 122 Md. 554 and *Carroll v. Manganese etc. Company,* 111 Md. 252, in support of its contention. That contention would be unanswerable, upon the authority of those cases, if Bernard had been a mere selling

agent appointed merely to sell the defendant's scrap metal, but, as we have pointed out, he was more than that. The appellant, so far as the record discloses, had no by-laws of any kind limiting the power of any of its officers or employees; all its corporate powers were exercised with the apparent consent and acquiescence of all of its stockholders, by Graeber; and Bernard, with the knowledge and consent of Graeber, throughout his connection with the company up to the execution of the contract in issue here, acted as the general or managing agent of the corporation. And if he, as he testified, was unable to secure purchasers who would buy the non-ferrous scrap metal from the destroyers, at a price satisfactory to the corporation, for deliveries to be made over a period of ninety days, and if he believed it was essential to the appellant's success that such purchasers be secured, it cannot be said, as a matter of law, that he did not, under the circumstances referred to, have the authority to employ and compensate, on behalf of the appellant, another to effect such a sale. For these reasons the first and fifth prayers of the defendant were properly refused.

Assuming that the court correctly instructed the jury that there was no evidence in the case that the appellant had ratified and adopted the Jennings contract, and that ruling is not questioned in this court, there is no apparent reason why the defendant's fourth prayer should not have been granted. By it, the appellant asked the court to instruct itself, sitting as a jury, that the appellee could not recover, unless Bernard had "actual" authority to make the contract sued on, or unless it, the appellant, held him out to the plaintiff as having such authority. The word "actual" as used in that prayer referred to the existence of the agency and not to the proof of it, because an agency created by inference from facts sufficient to justify the inference would be just as much an "actual" agency as one created by express words. And unless there was an "actual" agency, whether express or implied, or unless the appellant had "held the said James L. Bernard out as having such author-

ity to the plaintiff," so as to estop itself from denying his agency to execute the contract, it is difficult to see how the plaintiff could recover. That is to say, before Jennings could recover, he was bound to show that Bernard was in fact the appellant's agent, or that the appellant had by conduct, of which the appellee had knowledge, estopped itself from denying that fact, and the prayer covered both of those theories and should have been granted. 31 *Cyc.* 1219; *Mechem, Agency,* pars. 211, 722, 255.

The defendant's third prayer limited the plaintiff's damages to one half cent per pound for all the scrap copper "delivered" to the Federated Metals Corporation, while the contract sued on provided that he should receive one half cent per pound for the "entire tonnage of scrap copper" recovered from the four destroyers, in consideration of his producing a buyer who would buy the entire tonnage of scrap copper and lead from such vessels at prices satisfactory to the appellant, and was for that reason properly refused. No authority in support of the defendant's seventh prayer was submitted to this court, and it is sufficient to say that there was in our opinion no error in its refusal.

This brings us to a consideration of the plaintiff's prayers. No objection to the plaintiff's second prayer was urged in this court, and assuming that the plaintiff was entitled to recover at all, it correctly stated his theory of the case and was properly granted. His 3-B prayer, however, is open to the same objection as the defendant's third prayer, which is that it ignores the terms of the contract upon which it is predicated. It permits the plaintiff to recover a commission on the entire tonnage of non-ferrous·metals sold or agreed to be sold to the Federated Metals Company, whereas the contract limited his commissions to one half cent per pound on the entire tonnage of scrap copper and scrap lead taken from the four destroyers. It is apparently based upon the theory that the terms "scrap copper" and "scrap lead" are to be construed, as a matter of law, as synonymous with the term "non-ferrous metal." But we

cannot accept that theory. The letter of the contract provided that commissions should be calculated upon the quantity of "scrap lead" and "scrap copper" taken from the ships, and not upon the quantity of "non-ferrous metals" taken therefrom, and while all copper is non-ferrous, all non-ferrous metal is not copper. And while the plaintiff contends that the parties actually intended that commissions should be allowed on all non-ferrous metals sold to the Federated Metals Company or agreed to be sold to it, that intention is not expressed in the letter of the contract, and as its existence would at most be a matter of fact for the jury and not a matter of law for the court, that prayer should have been refused.

In the course of the trial a question arose as to whether the term "scrap copper" as used in the contract meant pure unalloyed copper, or whether it included all metals in which copper appeared as a basic element. In connection with that question the appellee, who was qualified to answer the question, was asked to state the difference between brass and copper. An objection to that question was overruled and that ruling is the subject of the first exception. The witness, in answer to that question, said that in the trade all compounded metals which depended on copper for their base were known as copper, and that in classifying the metals on "these boats the expression copper metals was from habit in the trade, and with full understanding of both parties, intended to cover all the metals which contained any percentage of copper, without designating any particular metals as showing certain percentage of the copper base." In *Williston on Contracts,* par. 607, it is said: "The ultimate standard then in contracts of which a memorial has been made is the proper local meaning, under the surrounding circumstances, of the words or symbols agreed upon by the parties." And while one of the primary rules in the interpretation of a contract is that the common or normal meaning will be given to the words in which it is expressed, yet if those words have locally a meaning

different from that commonly or generally given to them, and were so understood by the parties, the local meaning will be accepted as controlling, and by local meaning is meant that which is peculiar to a locality, a trade, a profession and the like. In *Shoop v. Fidelity & Deposit Co.,* 124 Md. 137, this Court said: "A word may be shown to have a special meaning in a certain trade or occupation. *Susquehanna Fertz. Co. v. White,* 66 Md. 444. This was well illustrated in the case of *Pinckney v. Dambmann,* 72 Md. 173, where it was held that it was competent to show by parol in the case of a sale of three "cargoes" of phosphate that a certain number of tons formed the average cargo in that trade." Applying these principles to the question before us, we find no error in this ruling. "Scrap copper," defined by any standard, has no precise and inflexible meaning. There are many kinds of copper, such as white copper, an alloy of copper zinc and nickel, velvet copper, a native sulphate of copper and aluminum, blanched copper, an alloy of copper and arsenic, and others. *Oxford Dictionary.* And where in the metal trade it was generally used to describe all metals in which copper appears as a basic element, and it was understood and used in that sense by the parties to the contract under consideration, that fact was not only relevant but essential to any correct interpretation of its terms.

Because of the errors committed in granting the plaintiff's 3-B prayer, and in refusing the defendant's fourth prayer, the judgment appealed from will be reversed, and the case remanded for a new trial.

> *Judgment reversed and case remanded for a new trial, the appellee to pay the costs in this court, the costs in the lower court to abide the final determination of the case.*