GEORGE PORTER HOUSTON, 3RD, v. MONU-MENTAL RADIO, INCORPORATED, ET AL.

[No. 60, October Term, 1929.]

294

*Decided January 15th, 1930.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Chester F. Morrow,* with whom were *Theodore R. Dankmeyer* and *Niles, Barton, Morrow & Yost* on the brief, for the appellant.

*Lewis W. Lake,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This is an appeal from a judgment of the Superior Court of Baltimore City on a directed verdict in favor of the defendants in an action of general assumpsit brought by George Porter Houston, 3rd, against the Monumental Radio, Incorporated, and R. V. O. Swartwout, for services which

the plaintiff claimed to have rendered in connection with the operation of a radio station in Baltimore City. The declaration contains the six common counts, and there was filed with it a bill of particulars which set out in detail the dates and periods of the alleged services as well as the value placed upon them by the plaintiff. While it is not apparent from these sources, it does appear from the evidence, and from the plaintiff's brief filed in this court, that the claim grows out of the defendant's alleged repudiation of an agreement under which he and the plaintiff were to conduct a radio business and share such profits as might accrue therefrom. The learned and careful judge who presided at the trial of the case below withdrew it from the jury at the close of the plaintiff's case, apparently upon the theory that the plaintiff had failed to show any contract express or implied upon which he could recover in a court of law. The appeal therefore requires us to review at some length the evidence in the case to discover: First, whether there was any contract at all between the parties; second, if there was, what its terms were; third, whether the defendant wrongfully refused to perform it; and fourth, if he did, whether the plaintiff can recover damages for such breach in a court of law.

In September and October, 1925, Houston, a qualified radio engineer, was, with Swartwout, whom he had known for a year, employed by the H. C. Roberts Electric Supply Company in its radio department. While so employed he and Swartwout discussed the possibility of taking over a broad-casting station, and especially a station then operated by "Brager's." Referring to these initial negotiations, Houston, testifying in his own behalf, said: "Knowing that 'Brager's' was dissatisfied, through a Mr. Supplee, as he told me, he asked me would I be willing to go in with him on the venture and take over the broadcasting station, I to operate the station, of course, and he would attend to his end of it of bringing in the business. He asked me if I would come in with him on this proposition, and said that we would make lots of money out of it if we went into it together, and that with me operating the station and his bringing in the busi-

ness that we could make a nice business of it, and naturally I was willing to do it." Swartwout, pursuant to that agreement, went ahead, made arrangements to take over the Brager station and operate it from the Metropolitan Club. The witness then went on to say that he and Swartwout, in discussing the cost of removing and relocating the plant, had "figured the thing out on an equitable basis between themselves", that he attended only to the technical details, and that Swartwout had charge of everything else, and throughout his testimony he reiterated time and again, by way of explaining his ignorance of any facts or figures other than his own physical labor, that he "had confidence in Mr. Swartwout." He was shown the bill of particulars, which itemized his claim, and said that the services recorded therein had been rendered and that the rates charged for them were fair. As thus shown, his claim was for 649 hours of labor at $1.25 per hour, between October 30th, 1925, and August 1st, 1926, and for salary for 81 weeks, between August 1st, 1926, and February 18th, 1928, at fifty dollars per week, aggregating $4,861.25, less cash payments made from time to time aggregating $3,339, leaving a net balance of $1,522.25.

From the time he started to work in 1925 until July 30th, 1926, he had no conversation of any kind with Swartwout in reference to any "settlement of his condition with the station," although they were constantly associated and discussed other things connected with its operation. During that period he received in all $169, and Swartwout explained that "we had been having a hard time, and this was our share of it, and we had only made just this much at another time, and things like that." In fact the station had not been very profitable up to that time, and he had no occasion to "doubt or question the amounts" he received.

On August 1st, 1926, Swartwout informed him that "he had a friend who thought would invest some money and if he did, we would go into it and operate the station, and he was also thinking of selling radio sets besides, and the money that he earned would be put up, would help us to buy the radio sets to sell, and we would go ahead on the same basis,

for me to operate the station and for Mr. Swartwout to attend to the business, and this other friend who would put in the money would be naturally taken into the organization, and we would devote our full time to it, not only selling the radios, but operating the station. Mr. Swartwout had always been anxious to go in business for himself, and wanted me to go in with him." Until that time they had both continued in the employ of Roberts & Co., but Swartwout then asked Houston if he would be willing to leave that company, and Houston replied that he would if he could get enough out of it to live on, which he thought would be about thirty dollars a week, and Swartwout paid him that sum for about six months, and from time to time it was increased, until his weekly salary in December, 1927, reached fifty dollars. After that the witness, Swartwout, and a Mr. Imbraguglio, who had contributed cash to the business, received a franchise to sell a certain make of radios, went ahead, and "operated the station and did the wholesale business jointly." After they had left Roberts & Co., Swartwout informed Houston that the "company" was being incorporated, and about a month and a half later he presented Houston with a share of stock, under circumstances which the witness thus described: " 'This is not all,' he said, 'I am giving you this as a mark of appreciation for the faithful way you have worked with me.' He said, 'This is not all, as soon as the matter is straightened out,' he said, 'you will receive your share,' and naturally that satisfied me."

Nothing further was said between them at that time, Houston was treated "as an equal" in everything that was done, and he had no reason to believe that his status in the corporation was any different from what he "had been given to understand" it had been up to that time, except that he was told that still another person would be "taken in to make up the corporation." Witness had no doubt about his "position," until he happened to discover a payroll slip which indicated that Swartwout was "taking so much money out of the business, compared with what" he was getting, that it

"disturbed him". When he made that discovery, Swartwout was ill, but when, on February 14th, 1928, he returned, Houston had an interview with him, of which the witness gave the following description: "I asked Mr. Swartwout what my position with the company was and he said, 'Well, I don't know exactly what you mean, explain yourself.' So I said, 'Were we not supposed to be partners here, and where is my share of the stock and the portion of the company that I was promised?' And he said, 'Well, I don't know that I promised you any, I did not mean to.' And that made me angry. And we rehearsed the whole events of the thing. And he said he may have given me the impression that he was taking me in the company, but he did not intend to; that he had everything tied up in his own name now, and he did not propose to relinquish any of it; and he said that I was laboring under a misunderstanding. I called the stenographer in, and when I did that he was very angry about it, my having the stenographer remain there, but I said it was to prevent any misunderstanding, and she stayed to corroborate what I am saying now. And then I rehearsed the whole events, the whole course of events from the time I was with Roberts up until that time, and he said he did not intend to do anything for me, that if I wanted to work along there, he would see that I was taken care of, that he always had a fatherly interest in me, and was going to make something of me, but he did not propose to give me anything in the company. * * * I told him that he had promised me, told me that it was to be a partnership, and he said that he had not, and of course that led to some discussion, and then he asked the stenographer to leave again, and I told her to stay, and he got mad, and said, 'Well, I had intended to do something for you, but in view of the stand you have taken in the matter, I do not intend to do anything,' and he said, besides, that he could not give me any of the stock, that all of the stock was tied up and subscribed; and then I asked him how he had gotten his, that he had not paid for his either, and he said that that was none of my business; and

that made me mad, naturally. So I said, why not give me his or part of his share, as he had intended to do in the first place; and he said that he did not propose to do it, that he had his hands on everything, and he was not going to have anything to do with any concern that he could not manage, and he did not propose to give up anything. * * * I said, 'Well, didn't you tell me it was to be a partnership,' and he said, 'Well, maybe I did, but you have just been a sucker'." Houston then went to his attorney, Mr. Morrow, with his claim, and when Swartwout received a letter from Mr. Morrow, he told Houston that they would "have to sever relations."

The cross-examination of the witness developed these additional facts. The radio station was owned by the Metropolitan Club until August, 1926, but after that witness thought that he and Swartwout owned it, and that under his arrangement with Swartwout they were to operate the station and "divide the profits"; that he and Swartwout were working on "an equal basis". When asked: "So, as a matter of fact, you do not know under the agreement—you cannot tell this jury under the agreement that you stated existed between you and Mr. Swartwout whether you have been fully compensated or not under that agreement, can you, because you do not know how much profit there was there to divide," he replied, "No, I do not know." The witness ceased to keep original entries after December, 1925, because Swartwout had said: "It will not be necessary to keep records any longer, because we were on a regular basis now, and the Metropolitan Club is not going to pay for any more construction or work on the station, and that everything we get out of it now will be what we make in profits." When asked upon what theory he claimed that Swartwout owed him money, he answered, "When Mr. Swartwout incorporated the Monumental Radio Company he did not include me in the incorporation, as I see it, and therefore I was working for a partner—in a partnership with Mr. Swartwout, and I certainly expected to still be part of the organization. I received $169 for ten

months' work, and that was all that I had received, and I certainly was entitled to more than that, the time of any operator is a whole lot more than that. The man I replaced in those operating hours got $50 a week for exactly the same work as I got $169 in ten months. However, I did exactly the same work." Further pressed, he said: "I worked with Mr. Swartwout as a partner until the time the station was incorporated. When the station was incorporated I was not included, so therefore I should be entitled to something for the hours that I worked at the station." He further testified that he did not know when he began to work for the corporation, because he did not know for a part of the time he was working for it that it existed, and that although he had worked for it from August 1st, 1926, until February 18th, 1928, he did not know at the time that he was working for it; that he claimed to be a half partner with Swartwout, that the partnership had never been dissolved and still existed; that he had never asked for what he supposed was his interest in the partnership until he and Swartwout had their argument"; that he was not discharged by Swartwout, but that their separation was mutual, although Swartwout had said that they should "separate company". When asked on redirect if the station had ever been profitable, he said: "It had been—by profitable I mean we did not make any particular amount of money, but we always paid expenses, as far as I have ever been able to determine. I mean that the station was always standing on its own feet. However, the station did not make any money, or that I could see it make any money, until the Columbia Broadcasting System was taken on and put through the station. * * * on September 1st, 1927." On re-cross he added that he knew that the company owed Fried-Eisman Company from $500 to $1,000, Roberts & Co. about $1,000, that Swartwout had endorsed the company's notes to borrow $2,000 or $3,000 to secure money to operate the station, and had transferred the title of his automobile to Roberts & Co.

Edward A. Strauf, president of the Metropolitan Club,

testified that, at a time when the club owned the radio station, Swartwout and Houston operated it under an arrangement whereby they received 80 per cent. and the club 20 per cent. of the gross profits accruing from its operation, and that in the course of his negotiations with Swartwout relating to that station Swartwout had informed him that Houston was a part owner of the station.

Miss Marie T. Mehrling corroborated Houston's account of the interview at which she was present, and, at the conclusion of her testimony, Houston was recalled for further cross-examination. He was shown two salary checks of the Monumental Radio, Incorporated, each for fifty dollars, dated respectively February 18th and February 20th, 1928. Both checks were signed by Swartwout as president and Imbraguglio as treasurer, and on the check of February 20th were the words "For settlement in full." He said that he had not seen the words last quoted on the check while it was in his possession, and reiterated that he had not been discharged, and, in describing the circumstances under which he severed his connection with Swartwout, he replied that Swartwout said: "The situation between the two of us was intolerable and strained, and, of course, it was natural I did not feel any particular liking for the man after that, and he said in view of the circumstances it would be wise if we could part, in fact he thought it over and thought that would be suitable to both of us, and it was very suitable to me, and so he said that, 'Here is your salary for the week,' and he said, 'You don't have to stay here any more if you don't like,' and I said, 'All right, that is perfectly satisfactory.'"

In response to a suggestion from the court, made in an effort to clarify the obscurity surrounding the formation of the alleged partnership agreement, the witness made this statement: "Mr. Swartwout asked me if I would like to go in business with him operating a broadcasting station, because he felt that broadcasting stations would be able to make money in the future. In 1924, broadcast advertising was just beginning to be recognized and I was always interested in radio and knew radio, and being naturally anxious to go into busi-

ness for myself, I acquiesced. And so, without very many words on the thing, we went into the proposition together. * * * Yes, our duties were definite. I was to take care of everything mechanical; in other words, I was to operate the station and give him something that he could sell. Q. And what was he to do? A. He was to sell the time and take care of all the financial matters. * * * The profits were to be divided between us."

Mrs. Mildred Houston, wife of the plaintiff, testified that on one occasion, when Swartwout visited them at her mother's home and she expressed a hope that at some time they would have a home of their own, Swartwout had replied, "Well, I don't think that will be very long. Things are brightening up and I think we will both be on easy street."

Defendant then read into the record extracts from the minute book of the Monumental Radio, Incorporated, which showed that: "the capital stock of the corporation is 1,000 shares at the par value of $100 each; that the directors for the first year were Robert V. O. Swartwout, Joseph Imbraguglio and George Eckhardt, Jr.; that on July 13th, 1926, is the minute showing that the company was organized, the charter accepted, and the following subscriptions to stock were received; Joseph Imbraguglio, 40 shares; Robert V. O. Swartwout, 9 shares; George Eckhardt, Jr., 1 share; that on the same date the secretary presented an offer from Mr. Robert V. O. Swartwout to sell to the corporation the radio broadcasting station known as WCAO, together with all its equipment, and a lease on the premises where the broadcasting station is housed, for the sum of $60,000, Mr. Swartwout to accept 600 shares of the corporate stock fully paid and non-assessable, for the broadcasting station; that that offer was accepted by the corporation."

At the conclusion of the case, the defendants offered ten prayers, each of which in one form or another amounted to a demurrer to the evidence. From this array the court elected to grant the ninth prayer and through it instructed the jury that there was no evidence in the case legally sufficient to entitle the plaintiff to recover, and directed them to find their

verdict for the defendants. That ruling, together with three exceptions noted during the progress of the case to rulings on evidence, we are called upon to review. The exceptions involving rulings on questions of evidence are free from difficulty, and as to them it is sufficient to say that the rulings involved in them are obviously harmless, apparently free from error of any kind, and certainly free from reversible error.

A more substantial and difficult question was raised by the action of the court in granting the ninth prayer of the defendants.

The appellant's contention is that the "understanding between Houston and Swartwout was too vague and indefinite in its terms to be enforced as a contract," and was also unenforceable under the Statute of Frauds, but that, Houston having rendered valuable services to Swartwout, the law implied a promise on the part of the latter to pay for them, and that under such circumstances he was entitled to recover the reasonable value of such services not only from Swartwout but also from the corporate defendant, which, he asserts, with full knowledge of the facts accepted the benefits of Houston's labor, and ratified and acquiesced in Swartwout's conduct in first inducing Houston to believe that he was to have an interest "of partnership" and then repudiating the understanding.

Turning to the first point, ordinarily, where one renders valuable service to another under a contract which for any reason is unenforceable, and the person benefited accepts such services knowing that the claimant expects compensation therefor, the law will imply a promise on his part to pay for them, which may be enforced in an action of assumpsit.

The action of assumpsit is necessarily based upon a contract (1 *Chitty on Pl.* [4th Ed.], 86; 5 C. J. 1381), which may be oral or written, express or implied. But whatever its form may be, it must possess all the elements of a binding, valid, and enforceable contract. To establish such a contract it must at least appear that the minds of the parties met in a common intent to create an obligation. And while such an intent may be inferred from conduct, no such infer-

ence can be drawn where the words or acts of the parties are inconsistent with the existence of such an intent. *Mattingly v. Mattingly,* 143 Md. 243. In 13 *C. J.* 263, it is asserted that: "In order that there may be an agreement, the parties must have a distinct intention common to both and without doubt or difference. Until all understand alike, there can be no assent, and, therefore, no contract. Both parties must assent to the same thing in the same sense, and their minds must meet as to all the terms." And while Professor Williston challenges the proposition that "intent to form a legal relation" is a requisite for the formation of a contract (*Williston on Contracts,* sec. 21), so far as we know no authority goes so far as to deny that where the acts or conduct of the parties create an inference that it was their intention that no contract should be made, one cannot be implied. *Brendel v. Strobel,* 25 Md. 401; *Cone v. Cross,* 72 Md. 105.

From the evidence in this case it may be inferred that Swartwout and Houston formed a partnership at will to take over and operate a radio station, which at the time the agreement was made was located at Brager's department store, and that the services rendered by Houston prior to the incorporation of the Monumental Radio, Incorporated, were rendered to the partnership, and that he had no intention of charging Swartwout with them. Under such circumstances, if Swartwout failed to account to him for the partnership profits, his remedy lay in a court of equity. *Rowley on Partnership,* sec. 743. For manifestly he could not recover from Swartwout individually for services which he as a partner rendered to the partnership. 47 *C. J.* 802, 806, 812. It is suggested that the agreement between Houston and Swartwout was too indefinite and uncertain to constitute an enforceable partnership contract, and that, even if it was not open to that criticism, it was void under the fourth section of the Statute of Frauds. But as the partnership was at will the Statute of Frauds was not applicable (*Rowley on Partnership,* sec. 212, *Frauds, Statute of,* 27 C. J. sec. 127); and in our opinion the criticism that the agreement was too indefinite and uncertain to create a partnership is not supported by the facts. The

evidence shows that Houston and Swartwout agreed to jointly carry on a business which is sufficiently identified, that the duties of each in respect to the operation of that business were definitely fixed, that is, that Houston was to attend to all technical and mechanical matters involved in its operation, and that Swartwout was to attend to all other matters connected with the business, that the "profits were to be divided between" them; that they both worked on an "equal basis," that Houston was to contribute to the business so much of his time, labor, and skill and technical knowledge as might be needed to construct and operate the station, and that Swartwout would do what was needed to secure it, house it, and secure business. While there was no express statement as to the proportion in which the profits were to be divided, it was sufficiently clear from the expressions quoted that they were to be divided equally. These facts, which were not disputed, afforded *prima facie* proof of a valid and enforceable partnership contract. *Rowley on Partnership,* sec. 216; 47 *C. J., Partnership,* sec. 865, note 12.

Appellant's claim for salary for services rendered after August 21st, 1926, presents an entirely different question. Until the incorporation of the Monumental Radio, Incorporated, on July 13th, 1926, upon the appellant's evidence, he and Swartwout conducted a radio business as a partnership. At some time between that date and August 1st, 1926, the partnership ceased to be an active functioning organization, because all of its assets were transferred to the corporation, and the purpose for which it was formed came to an end. The act of Swartwout in assigning to the corporation all the partnership assets, whether its effect was to actually transfer such assets or only his interest in them, in itself worked a dissolution of the partnership (*Rowley on Partnership,* sec. 591), (a) because the purpose for which it had been formed was defeated by the transfer, (b) it introduced a new member or members in the firm (*White v. White,* 5 Gill, 359), and (c) a corporation cannot enter a partnership, at least in the absence of special statutory authority. *Ibid,* sec. 193. In reaching that conclusion, we are not to be understood as de-

ciding that the assignment from Swartwout to the corporation had any effect except to transfer Swartwout's interest in the partnership assets, for the confused and unsatisfactory condition of the record makes it impossible to determine the extent of the interest in the property which Swartwout assigned. But it may be inferred that from August 1st, 1926, the station and the lease of the premises on which it was located were owned by the corporation, and from that time on the station was operated by it.

But while that was so, the appellant asserts that he knew nothing of the termination of the partnership or the transfer of its assets, or at least of Swartwout's interest in them, to the corporation, but was misled by Swartwout, and induced by him to believe that he was still in partnership with him, and that he continued his work in connection with the station at an inadequate salary, in the belief that he was still working for the partnership and would receive the difference between the salary actually paid him and fair compensation from the partnership profits.

Without attempting to weigh Houston's statement that he did not know that the corporation was operating the station after August 1st, 1926, in connection with his admission that Swartwout gave him a share of its stock and promised to give him more, yet in view of evidence indicating his apparent ignorance of ordinary business affairs and his implicit reliance on Swartwout, the credibility of that statement was for the jury. And aside from that there is evidence of a more substantial character to the effect that he was induced by Swartwout to believe that, if he continued his work at the station and would be content with a small salary, he would be compensated for his sacrifice later, by being given a share in the "station" or the "partnership" and its profits. It also appears that he rendered valuable services to the corporation, which it accepted, that he was paid less for those services than they were reasonably worth, and that it and Swartwout refused to recognize his alleged agreement with Swartwout, and that Swartwout finally told him that they had better separate, and gave him on different

occasions two of the corporation's checks, each for $50, in payment of his salary for the last two weeks of his service.

The evidence is insufficient to establish an express contract of any kind between Houston and Swartwout, or between him and any other person at all upon any subject, after the incorporation of the Monumental Radio, Incorporated, company. He did testify that Swartwout came to him on or about August 1st, 1926, which was some time after he had undertaken to transfer all the partnership assets to the corporation, and told him that he, Swartwout, had a friend who would, "he thought," invest some money in the enterprise; that the business would be extended to include the selling of radio sets; and that the friend would "naturally be taken into the organization"; and that they would go ahead "on the same basis for me to operate the station and for Mr. Swartwout to attend to the business" (referring apparently to a division of labor and not of assets), and asked Houston if he would be willing "to leave Roberts"; that he "understood" that they did the wholesale business "jointly"; and by "jointly" he meant Swartwout, Imbraguglio and himself. In addition to that more or less meaningless testimony, the only evidence, if it can be so called, to be found in the record, relating to appellant's alleged contract of partnership with Swartwout, made after the sale of the station to the corporation, is a mere tissue of speculation and conjecture as to what the witness "understood" or "expected" or "figured". But there is a total lack of evidence tending to show that Imbraguglio ever heard of, must less assented to, any partnership, or what the proportionate interests of the several partners would be, or that the partnership, as distinguished from the corporation, ever, after August 1st, 1926, had any assets or did any business. The evidence in the case was, therefore, in our opinion insufficient to show a valid partnership contract between Houston, Swartwout and Imbraguglio, or that Houston and Swartwout formed a new partnership after the termination of their original contract.

But there is some evidence tending to show that Houston believed that the radio station was operated by a partnership of which he was a member, that because of that belief he rendered useful service to the corporation which in fact operated it, and that he accepted for such services less money than they were reasonably worth, that the corporation through its officers knew of that delusion, and with that knowledge continued to accept such services. Under such circumstances it is implied in fact that it undertook and promised to pay to the appellant the difference, if any, between the amounts actually paid him and the reasonable worth of his services (*Williston on Contracts,* secs. 36, 36a; *Day v. Caton,* 119 Mass. 513; *Elliott on Contracts and Suppl.,* sec. 1363; *Wash., B. & A. Elec R. Co. v. Moss,* 127 Md. 12; *Hamilton v. Thirston,* 93 Md. 220; *Baker v. Lauterbach,* 68 Md. 69), which amount he may recover in an action of assumpsit. *Wash., B. & A. Elec. R. Co. v. Moss. supra; Elliott on Contracts,* sec. 1363.

But the action is against the Monumental Radio, Incorporated, and Swartwout, and appellees contend that, even if the appellant has a cause of action against them or either of them, it is several and not joint, and that he cannot recover on it in a joint action against both. But that proposition is without substantial merit, whether it is based upon procedural rules or substantive law. The fact that the evidence failed to show a joint liability in both defendants could not prevent the plaintiff from recovering severally against one shown to be liable. Code, art. 50, sec. 12; *Canton Co. v. Seal,* 144 Md. 181.

The proposition is also objectionable as a statement of substantive law. Houston's claim in this case is necessarily based upon his acceptance of an implied offer made by Swartwout that if he, Houston, would do certain work in connection with the radio station, he would be paid the reasonable worth of his labor. When he made that offer Swartwout occupied a dual position. He was the president of the corporation and he held a majority of its stock. It

may be inferred, therefore, that in making the offer he acted not only for the corporation but for himself. And while the immediate and direct benefit of appellant's labor accrued to the corporation, nevertheless the basis of his right to compensation lay, not in the benefit to either or both of the promisors, but to his acceptance of their offer. For if one by his promise to pay therefor induces another to do some act, and the other accepts the offer and renders the service, he is entitled to recover the reasonable worth of such service, regardless of whether the promisor received any personal or individual benefit therefrom. *Wells v. Turner,* 16 Md. 143; *Williston on Contracts,* sec. 91. In this case the implication that there was an offer grew out of Swartwout's conduct in inducing Houston to give valuable service in operating the radio station at less than its fair value, by deluding him with the false impression that he, Houston, had a proprietary interest in it, and would share in any profits that might result from its operation. In view of his position as president and majority stockholder of the company, it cannot be said, as a matter of law, that in doing that Swartwout acted for himself or for the corporation or for both. Whether he acted in the one capacity or the other was essentially a jury question, to be determined in connection with the other facts and circumstances of the case. It follows that there was error in granting defendant's ninth prayer, and the judgment appealed from must be reversed.

*Judgment reversed with costs, and case remanded for a new trial.*