[No. 32474. Department Two. January 21, 1954.]

MILL & LOGGING SUPPLY COMPANY, *Appellant,* v. WEST TENINO LUMBER COMPANY, *Respondent.*[1]

[1]Reported in 265 P. (2d) 807.

*Parr & Baker* and *Donley & Ingram,* for appellant.

*Bogle, Bogle & Gates,* for respondent.

FINLEY, J.—This suit was brought against West Tenino Lumber Company, a corporation, to obtain a money judgment in connection with certain machinery and supplies allegedly sold to Ulysses S. Herrington for use in a mill, owned by him prior to November 23, 1948, but now said to be owned by the defendant corporation. The latter moved to have plaintiff's amended complaint stricken and, alternatively, demurred on the grounds that it did not state facts sufficient to constitute a cause of action. The trial court denied the motion to strike but sustained the general demurrer. The plaintiff, refusing to plead further, stood upon its amended complaint and is now appealing from the trial court judgment of dismissal.

The important facts *alleged in the amended complaint* are as follows: Prior to November 23, 1948, one Ulysses S. Herrington was the owner of the Herrington Milling Company at Tenino, Washington. T. M. Draper and Baldwin Chain Service, Inc., both being assignors of the appellant, sold machinery, mill fixtures, and supplies to the Herrington Milling Company. Unknown to appellant and its assignors, on November 23, 1948, Herrington gave to the Thurston County Investment Company, a partnership, a bill of sale to the Herrington Milling Company. No bulk sales affidavit was filed by Herrington. The amended complaint further states that, on June 25, 1949, the Thurston County Investment Company transferred all of its right, title, and interest to the respondent, the West Tenino Lumber Company, Inc.; that the appellant and its two assignors continued to deal with Herrington, selling mill supplies, machinery, and equipment to him until early in 1950; that, during this time,

Herrington continued to hold himself out as the owner of the mill, and that, at all times during which appellant and its assignors transacted business with the Herrington Milling Company, it was with the understanding that Herrington was the owner.

Allegedly, in March, 1950, a receiver was appointed for the Herrington Milling Company, and it was then disclosed that either Thurston County Investment Company or West Tenino Lumber Company had owned the Herrington Milling Company since November 23, 1948. Purportedly, early in 1950, the Herrington Milling Company was indebted to appellant in the sum of $5,757.84; and was indebted to appellant's assignors, T. M. Draper and Baldwin Chain Service, Inc., in the sums of $4,000 and $4,918, respectively. The complaint states that the machinery, supplies, and equipment sold to the Herrington Milling Company were placed in the mill used to manufacture lumber for the benefit and profit of respondent and its predecessor, the Thurston County Investment Company.

Appellant's complaint concluded by alleging that the Herrington Milling Company (acquired and owned by respondent) was enriched in the amount of $14,658.02, and prayed for a judgment in that amount.

The problem presented by this appeal is whether appellant's amended complaint stated a cause of action under either of two theories: (1) That failure to comply with the bulk sales act rendered respondent liable for losses suffered by appellant; (2) that respondent has been unjustly enriched at appellant's expense and, consequently, is liable to the latter. In this opinion, we affirm the trial court, hold that no cause of action was stated and the demurrer was properly sustained as to theory (1), mentioned above, but we reverse the trial court, and hold to the contrary as to theory (2).

There are at least two reasons why appellant may not recover upon the theory that the respondent did not comply with the bulk sales act. The act, Rem. Rev. Stat. (Sup.) § 5833 [*cf.* RCW 63.08.050], provides, in part:

"Whenever any person shall bargain for, or purchase, all or substantially all of any stock of goods, wares or merchandise, . . . and/or substantially all of the fixtures and equipment used in and about the business of the vendor, in bulk, for cash or credit, and shall pay any part of the purchase price, or execute, or deliver to the vendor thereof, or to his order, or to any person for his use, any promissory note or other evidence of indebtedness for said purchase price, or any part thereof, without first having demanded and received from said vendor or from his agent, the statements provided for in section 5832 [providing for an affidavit of vendor listing creditors], . . . and without filing the verified statements in the office of the County Auditor at least five days before the consummation of the purchase as provided in the preceding section, *such sale, or transfer, shall be fraudulent and void as to creditors of the vendor, . . .*" (Italics ours.)

The purchasing of a stock of goods in bulk, without having obtained and filed the required bulk sales affidavit, simply renders the sale or transfer fraudulent and void. Under the foregoing circumstances, no other factors or relationships being involved, clearly a creditor's legal remedy against the purchaser of a stock of goods in bulk depends upon the establishment, legally, of a debt against the vendor. This cannot be done in a suit directly against the bulk sales purchaser without first obtaining a judgment, or at least commencing an action against the vendor.

In *Rothchild Bros. v. Trewella,* 36 Wash. 679, 79 P. 480, a creditor of Kennedy sued the purchaser of Kennedy's business and stock in trade. No action had been instituted by the creditor against Kennedy to obtain a judgment covering the indebtedness, and the purchaser-defendant had never assumed nor promised to pay the indebtedness. This court, in reversing a trial court judgment in favor of the creditor-plaintiff, said:

"The sole question presented on this appeal is this: Can a creditor of a vendor who sells property in bulk, without a compliance with the above mentioned act, maintain a direct action at law against the purchaser, to recover the amount of his debt? We think that he cannot. The only effect of a failure to comply with the requirements of the

act, so far as the purchaser is concerned, is to render the sale fraudulent and void. It does not differ from any other transfer made in fraud of creditors, except in the matter of the proof of the fraud. It gives the creditor no direct remedy against the purchaser, either in terms or by implication. . . .

"It seems to be firmly established that the only remedy which the law affords a creditor against a fraudulent transfer of property by his debtor is to sue his debtor, and reach the property fraudulently transferred *by attachment or garnishment.* These remedies would seem to be adequate in all cases where the subject of the transfer is tangible personal property." (Italics ours.)

Secondly, appellant's amended complaint fails to state a cause of action under the bulk sales act because the latter does not apply to bulk sales made by manufacturing businesses. The act, Rem. Rev. Stat. (Sup.), § 5835 [*cf.* RCW 63.08.010], provides, in part:

"Any sale, . . . of all or substantially all of any stock of goods, wares, or merchandise, and/or all or substantially all of the fixtures and equipment used in and about the business of a vendor *engaged in the business of buying and selling and dealing in goods, wares or merchandise, of any kind or description,* or in the business of operating a restaurant, cafe, beer parlor, tavern, hotel, club or gasoline service station, . . . shall be deemed a sale and transfer in bulk, in contemplation of this act: . . ." (Italics ours.)

The above italicized words describe the *type* of businesses affected by the act. The plain meaning of these words would seem to indicate that only mercantile businesses are affected, and that manufacturing businesses are not. A review of the cases and the legislative history of the act confirms this construction.

The bulk sales act was originally enacted in 1901 (Laws of 1901, ch. 109, p. 222). As originally enacted, the limiting words, *"engaged in the business of buying and selling and dealing in goods, wares or merchandise, of any kind or description,"* which define vendor in the present statute, were not contained in the 1901 act.

An analysis of the pertinent cases shows that the afore-

mentioned omission of the limiting words caused some confusion as to which types of businesses were governed by the act. This court first construed the act in 1903, in *McDaniels v. J. J. Connelly Shoe Co.*, 30 Wash. 549, 71 Pac. 37, saying:

"[The act] . . . was intended to prevent retail dealers in goods, wares, and merchandise from defrauding their creditors. . . .

"It is well known that the business of retailing goods, wares, and merchandise is conducted largely upon credit, and furnishes an opportunity for the commission of frauds upon creditors not usual in other classes of business."

However, in *Plass v. Morgan*, 36 Wash. 160, 78 Pac. 784, this court took a different view. The vendor in that case had sold "all the goods, wares, and merchandise in bulk" of his business of conducting *a boarding house and restaurant.* The statute at that time did not expressly include restaurants within its scope. In rejecting respondent's argument, that the act applied exclusively to mercantile business, the court said:

"It was the evident intent of the legislature to prevent the perpetration of fraud upon the creditors of people who are engaged in business, and, while there seems to be no authority submitted on this proposition, and none that we have been able to obtain, we do not see our way clear to exempt the defendant in this case from the liabilities imposed by this statute, or to deprive his creditors of the protection which it seems to guarantee to those who furnish goods to parties engaged in business."

In *Everett Produce Co. v. Smith Bros.*, 40 Wash. 566, 82 Pac. 905, this court held that a sale of horses and carriages of a livery stable was not within the contemplation of the act, thus again tending to limit the scope of the act to mercantile businesses. At the extraordinary session of the legislature in 1925, the judiciary revision committee submitted an amended act, saying:

" 'We believe that this last case [*Everett Produce Co. v. Smith Bros., supra,*] should be taken as overruling the *Plass* case, but . . . not being sure, and believing that certainty in the law is of almost as great importance as the

law itself, we have prepared both of the revised bills in such language as we believe will make them apply to mercantile businesses. . . .'" (Reported in IV Wash. L. Rev. 97, 100, Driscoll, The "Sales in Bulk" Act.)

The amended act (Laws of 1925, ch. 135, § 1, p. 338) employed the same words as are found in the present day act to define which vendors were contemplated. Those vendors ". . . engaged in the business of buying and selling and dealing in goods, wares or merchandise, of any kind or description" were made subject to the provisions of the act. There is no doubt that the legislative intent, in so defining the term vendor, was to limit the application of the act to mercantile type businesses. This court so found in *Garner v. Thompson,* 161 Wash. 317, 296 Pac. 1043, decided in 1931. This was prior to the amendment of 1939, in which restaurants were expressly included within the scope of the statute. In the *Garner* case, in holding that restaurants were not included within the act, this court noted the change made by the 1925 amendment, and then said:

"Thompson was engaged solely in the restaurant business. He was not engaged in the confectionery or cigar business. He was in no sense engaged in the business of buying and selling and dealing in goods, wares, or merchandise, and was clearly not within the bulk sales act. True, he purchased meat, vegetables, and other foodstuffs, and converted them into edible dishes, which he sold within the restaurant building, and he also prepared lunches, which were carried away and eaten elsewhere. That, however, does not transform the restaurant business into one of buying and selling and dealing in goods, wares or merchandise."

Since the present act applies to the mercantile type businesses (and to other specifically enumerated businesses not here involved), the sale of the lumber mill in the instant case is not within its scope. The trial court very properly sustained the demurrer in so far as the complaint attempted to state a cause of action under the bulk sales act.

The appellant seems to contend that respondent is somehow liable for goods sold to Herrington and the Thurston County Investment Company before respondent became

the owner of the mill. However, the complaint contains no allegations that Herrington was insolvent at the time he sold the mill or that the sale was without consideration. Appellant stated no facts to show a fraudulent conveyance under any section of chapter 19.40 of RCW, Fraudulent Conveyances. Thus, the complaint poses no liability as to Herrington's transferee, the Thurston County Investment Company, or respondent, for goods purchased by Herrington while he was still owner of the mill.

It appears from the complaint that some goods were, or may have been, sold to the Herrington Milling Company at the time the Thurston County Investment Company, a partnership, was the owner. It is clear that appellant may not recover from respondent for the value of these goods. In 8 Fletcher Cyclopedia Corporations 393, § 4012, it is said:

"Unless the corporation has expressly assumed the debts and obligations of its predecessor, its liability, if it exists at all, must arise by implication or presumption, out of the facts and circumstances attending the incorporation, and the acquisition by the corporation of the assets and property of the firm or association, and it is quite obvious that these must be peculiar to each case and are very seldom exactly the same in any two cases. *The corporation, of course, would not be liable on the partnership obligations where no showing is made that it either expressly or impliedly assumed them.*" (Italics ours.)

Although it does not appear from the complaint whether the respondent corporation was an existing organization before the transfer to it of the partnership's "right, title and interest," or whether its incorporation was merely a change in the partnership's business structure, the latter mentioned rule would be applicable in either event.

Appellant, in its complaint, did not allege that the respondent corporation expressly or impliedly assumed the obligations of the partnership. Therefore, any debts incurred by the partnership (the Thurston County Investment Company) are not chargeable against respondent. In addition, in passing, we observe that the latter company was not made a party defendant in the lawsuit.

The final and most difficult question pertains to the machinery, equipment, and supplies allegedly sold by appellant and its assignors to the Herrington Milling Company *after* ownership in the company had been transferred to respondent. Appellant claims that the respondent corporation has been thereby unjustly enriched. The essential facts alleged in its complaint are as follows:

"That this plaintiff and assignors continued to deal with Ulysses S. Herrington, and continued to sell mill supplies, machinery and equipment to said Ulysses S. Herrington until some time in the early part of the year 1950; . . ." and

"That on June 25, 1949 the Thurston County Investment Company transferred all of its right, title and interest to the West Tenino Lumber Company, Incorporated; . . . that all during the time that the plaintiff and its assignors transacted business with the Herrington Milling Company it was with the knowledge and understanding that Ulysses S. Herrington was the owner thereof; that plaintiff and its assignors had no knowledge that Ulysses S. Herrington was not the owner of this mill until March of 1950 . . ." and, finally:

" . . . that this mill has been increased in value by the supplies, machinery and milling equipment purchased from plaintiff in the sum of $14,658.02 . . ."

It may be noted that appellant failed to allege *explicitly* that respondent knew or had reason to know that the goods were sold in the mistaken belief that they would inure to the benefit of Herrington. However, the foregoing can be fairly inferred from the facts actually pleaded, namely, that respondent acquired Herrington's interest in the mill and became the owner thereof; that Herrington, the former owner, continued to operate the mill and was allowed by respondent to hold himself out as owner at the time the goods were sold, acquired, and used in the mill.

 In *Slater v. Bird,* 40 Wn. (2d) 848, 246 P. (2d) 460, we said:

"In determining whether or not a complaint is sufficient as against a demurrer, the pleadings, taken as a whole, will be liberally construed. RCW 4.36.050 [*cf.* Rem. Rev. Stat., § 285]; *McMahan v. Mutual Benefit Health & Accident*

*Ass'n.*, 28 Wn. (2d) 202, 182 P. (2d) 4. Allegations of well-pleaded facts, *together with the reasonable inferences therefrom,* are admitted by the demurrer to be true. *Puget Mill Co. v. Duecy,* 1 Wn. (2d) 421, 96 P. (2d) 571; *Cotton v. Morck Hotel Co.,* 32 Wn. (2d) 326, 201 P. (2d) 711." (Italics ours.)

Our problem is to determine whether the facts alleged are sufficient to show that respondent has been unjustly enriched at appellant's expense, so that we may fairly say the law should imply a promise to pay for goods received and used in respondent's mill.

The respondent has been careful to point out that appellant's complaint nowhere states what the relationship was between Herrington and his transferee, and that there was certainly no allegation that Herrington was an agent of respondent. Yet lack of privity is not fatal to appellant's attempt to state a cause of action in quasi-contract. In this connection, it is necessary to distinguish between implied-in-fact contracts and quasi-contracts.

In defining implied-in-fact contracts and quasi-contracts, this court said in *Edwards v. Surety Finance Co.,* 176 Wash. 534, 30 P. (2d) 225:

"[An implied promise must] be such as is within the contemplation of the parties when making the contract, or else necessary to carry their intention into effect. . . .

"In addition to such contracts as draw their efficacy from the consent of the parties, there is a class of legal obligations which, though of a contractual nature, are not based on contract or consent. These are sometimes spoken of as contracts implied in law, but are usually referred to as quasi, or constructive, contracts. For the purpose of applying the contractual remedy of *assumpsit,* the law imposes upon such obligation a fictitious promise to pay. The liability upon an obligation of this kind arises purely upon an implication of law, independent of agreement or intention. The law in such cases establishes a duty which may be contrary to the intention of either one, or both, of the parties. 6 R. C. L., p. 588, § 7."

Want of privity between parties is no obstacle to recovery under quasi-contract. *King County v. Odman,* 8 Wn. (2d) 32, 111 P. (2d) 228, 133 A. L. R. 1440. In the *Odman* case, it was said:

"A quasi-contract derives its efficacy not from the consent of the parties but from an implication having its basis in law, independent of agreement or intention. The obligation so imposed rests upon the principle that the law will assume that a man has promised to do what it is certain he should do."

We have stated the fundamental basis for recovery on quasi-contract arising from unjust enrichment in *Bill v. Gattavara,* 34 Wn. (2d) 645, 209 P. (2d) 457, wherein we said:

" 'Quasi contracts' are not true contracts but are obligations created by the law when money or property has been placed in one person's possession, under such circumstances that, in equity and good conscience, he ought not to retain it."

In resolving the somewhat novel fact situation before us, it seems desirable to analyze the cases in which quasi-contract relief has been granted. As stated in 1 Mo. L. Rev. 223, 236:

"The law of quasi contracts is not a well understood subject. No digest heading brings together its precedents. They are scattered from Abandonment to Zoning, and only the practiced eye can pick them out."

Thus, persuasive precedents for determining the instant case may be found under the following headings, *inter alia*: Work and Labor, Money Received, and Principal and Agent.

In *Houston v. Monumental Radio,* 158 Md. 292, 148 Atl. 536, under a somewhat analogous fact situation, it was held that the plaintiff might recover the reasonable value of services rendered to the defendant corporation. In that case, a corporation which had taken over operation of a radio station, knowing that the plaintiff believed the station was operated by a partnership of which he was a member, continued to accept plaintiff's services. After holding that the evidence was insufficient to establish an express contract of any kind for plaintiff's services, it was decided that, under plaintiff's evidence, there was an implied contract to pay him the difference, if any, between the amounts actually paid him and the reasonable worth of his services. Though

not so denominated, it would seem that quasi-contract was the proper basis for the holding.

In *Smith v. Kneisley,* 187 Wash. 278, 60 P. (2d) 14, although recovery was denied to an attorney for services rendered in collecting insurance proceeds, we said:

"In order to incur a liability in the absence of an agreement, one must knowingly permit another to act in his behalf and knowingly accept the benefit of his services. Respondent failed to establish in this case either of the elements mentioned."

In the early case of *Soderberg v. King County,* 15 Wash. 194, 45 Pac. 785, this court held that, in an action for money had and received, a plaintiff could recover sums charged by the sheriff as commissions upon foreclosure sales and by him mistakenly paid into the county treasury, when such sums constituted a surplus in his hands to which the judgment debtor was entitled.

In *Bluefield National Bank v. Picklesimer,* 102 W. Va. 128, 135 S. E. 257, the court said:

"A principal, benefited by an unauthorized act of his agent, cannot deny the authority of the agent to do the act from which such benefit accrued, without first having restored the property or other thing so acquired, or paid to the injured party the value thereof. *Union Bank & Trust Co. v. Long Pole Lumber Co.,* 70 W. Va. 558, 74 S. E. 674."

Another body of cases, perhaps more closely related factually to the problem at hand, involves actions in which a plaintiff, under an unenforcible contract or through mistake of fact, erects improvements on a defendant's land and then seeks recovery in quasi-contract.

Thus, in *Hardgrove v. Bowman,* 10 Wn. (2d) 136, 116 P. (2d) 336, we said:

"The action is brought upon the doctrine of unjust enrichment, which is recognized and applied in a number of our decisions. *Ernst v. Schmidt,* 66 Wash. 452, 119 Pac. 828, Ann. Cas. 1913C, 389; *Gregory v. Peabody,* 149 Wash. 227, 270 Pac. 825. The underlying theory of the doctrine is that, where one expends money and labor in the improvement of the property of another upon the faith of an unenforcible contract, he is, upon repudiation of the agreement by the

owner, entitled to be reimbursed for improvements enhancing the value of the property. *Pitt v. Moore,* 99 N. C. 85, 5 S. E. 389, 6 Am. St. 489."

A more complete statement of the above principle may be found in *Rhyne v. Sheppard,* 224 N. C. 734, 32 S. E. (2d) 316, where it was said:

"Where a person has officiously conferred a benefit upon another, the other is enriched but is not considered to be unjustly enriched. The recipient of a benefit voluntarily bestowed without solicitation or inducement is not liable for their value. But he cannot retain a benefit which knowingly he has permitted another to confer upon him by mistake.

" 'It is said to be a very familiar rule of the law of estoppel that if the owner of an estate stands by and sees another erect improvements on the estate in good faith in the belief that he has a right to do so, and does not interpose to prevent the work, he will not be permitted to claim such improvements after they are erected.' 27 Am. Jur., 275; see also Anno. 76 A. L. R., 304.

"It has been held also that where one, under a mistake as to the location of his own premises, in good faith, and without inexcusable negligence, makes improvements upon the land of another, and the latter, knowing of the making of the improvements, but being himself ignorant of the mistake in location, fails to make objection, the improver may obtain suitable relief in equity. 27 Am. Jur., 276; Anno. 104 A. L. R., 597."

It may be seen from the above partial summary of cases, in which in some form quasi-contract relief has been granted, that this remedy is very broad. The editors of the Restatement of Restitution, adopted by the American Law Institute in 1936, have sought to gather together in a single volume most of the fact patterns which may give rise to quasi-contracts.

Restatement of the Law of Restitution 155, § 40 (c), is perhaps most applicable to our problem. There it is said:

"A person who has rendered services to another or services which have inured to the benefit of another or who has affixed chattels to the land or chattels of another is entitled to restitution therefor if the services were rendered or the chattels were affixed: . . .

"(c) in the mistaken belief, of which the other knew or had reason to know, that the services would inure to the benefit of the one giving them *or of a third person,* or that the other promised to pay for them." (Italics ours.)

Although the quoted section of the Restatement refers to the rendering of services or affixing of chattels to the land, or chattels of another, the reason for the rule is directly and necessarily applicable to the furnishing of goods as in the instant case.

██ The significant fact to be derived from the complaint, which constitutes the enrichment of respondent as *unjust* enrichment, is the acquiescence of respondent in the transactions between appellant, appellant's assignors, and Herrington, with resultant unjust benefits to respondent; or, stated differently and perhaps more strongly, it was respondent's failure to notify the sellers of the goods that it owned the mill and, as owner, would refuse to pay for them. The receipt of the goods and the use thereof by respondent, together with its failure to disclose its ownership of the mill, is the gist of the matter. We think the complaint stated a cause of action for unjust enrichment in connection with which relief may be granted, if, upon further proceedings in accordance herewith, appellant's proof is sufficient to support the pertinent allegations of its complaint.

The judgment of the trial court is reversed in part, and the case is remanded for further proceedings in accordance with the views expressed herein.

GRADY, C. J., SCHWELLENBACH, HAMLEY, and DONWORTH, JJ., concur.