### WHITE ET UX. *v.* FRIEL ET AL., TRADING AS FRIEL LUMBER COMPANY

[No. 149, October Term, 1955.]

*Decided June 14, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Z. H. Stafford* and *William H. Adkins, II,* for appellants.

*B. Hackett Turner,* with whom were *Turner & Turner* and *J. Harry Cross* on the brief, for appellees.

BRUNE, C. J., delivered the opinion of the Court.

The defendants appeal from a summary judgment against them for $2849.71 and costs rendered by the Circuit Court for Queen Anne's County in a suit brought by the plaintiffs to recover for building supplies allegedly sold to the defendants.

The defendants-appellants, Elmer J. White, Sr., and Augusta M. White, are husband and wife. At some time in 1952 they obtained an option on a farm in Queen Anne's County, and at about that time Mr. White entered into possession of the farm. They acquired title to it as tenants by the entireties on May 4, 1953.

Mr. and Mrs. White and their son, Elmer J. White, Jr., owned all of the stock of a Maryland corporation known as the E. J. White Engineering Corporation (the "Corporation") which had been incorporated in June, 1950. Mr. White, Sr., owned 3,000 shares, Mrs. White owned 500 and Mr. White, Jr., owned 500, for which they paid, in the aggregate, $4,000. They constituted the entire Board of Directors. Mr. White, Sr., was President, Mr. White, Jr., was Vice President, and Mrs. White, Sr., was Secretary. Who, if anyone, was Treasurer does not appear.

The nature and extent of the Corporation's business does not appear clearly. Evidently it was engaged in some form of engineering work and evidently it did not meet with financial success, for it went into receivership in January, 1954.

This suit was brought in 1954 by the plaintiffs, trading as Friel Lumber Company, against the individual defendants named above on an open account to recover the price of "Materials supplied to repair house on farm and repair other buildings jointly held." The items enumerated in the account appear to have been sold on various dates between June 13, 1952, and August 6, 1953, both dates inclusive, though it is not clear whether two sales in small amounts were made in May, 1952, or May, 1953. The great majority of the sales, in amount at least, were made in the period between early June and late October of 1952. There is no segregation whatever

of the items or charges as between those for use in repairing the house, in constructing other buildings or in repairing other buildings.

The plaintiffs filed a motion for summary judgment with their declaration. The affidavit in support of the motion was made by one of the plaintiffs. It showed that the affiant was a partner in the plaintiff firm, and stated that he was "competent to testify to the matters hereinafter set forth," and that he "made oath, on personal knowledge, in due form of law, that there is justly due and owing by Elmer J. White and Augusta M. White, his wife, the Defendants, * * * to the Plaintiff, Friel Lumber Company, for lumber and building materials sold by the Plaintiff to the Defendants, the sum of * * * ($2,849.71), with interest from ......, over and above all discounts, and without deduction or set off, *to the best of his knowledge and belief.*" (Italics ours.)

Each of the defendants pleaded the general issue pleas in response to the declaration, and each of them filed an answer to the motion for summary judgment. Each of the answers categorically asserted that the defendant "had never requested, contracted or ordered nor received from the Plaintiff the material and supplies set forth in the Plaintiff's declaration but that the said material and supplies were ordered, contracted and delivered to the E. J. White Engineering Corporation by the Plaintiff and that the Plaintiff has so billed said Corporation for said materials and goods." The affidavits supporting these answers recited that the affiant "made oath in due form of law that the aforegoing facts are *true to the best of his* [or her] *knowledge and belief.*" (Italics ours.) Neither of these affidavits recited that it was made on personal knowledge, and neither stated affirmatively that the affiant was competent to testify to the matters stated therein. We may assume that the defendants necessarily had personal knowledge of whether they had or had not ordered the materials and were competent to testify with regard thereto, but two deficiencies remain in their affidavits. One is that they contained no affirmative showing, as required by Summary Judgment Rule 2 (G.R.P.P., Part Two, Subdivi-

sion IV, Rule 2), that the affiants were competent to testify with regard to the deliveries to the Corporation or with regard to the plaintiff having billed the goods to it. The other is that an affidavit to the effect that an allegation is true to the best of one's knowledge and belief is not a sufficient affidavit under the Rule just cited. *Fletcher v. Flournoy*, 198 Md. 53, 81 A. 2d 232.

The plaintiffs urge strongly the defects in the defendants' affidavits in support of their answers, but their own affidavit in support of their motion is open to the second objection to the defendants' affidavit, for it is qualified by the almost identical phrase, "to the best of his knowledge and belief." Since the plaintiffs' motion was filed before the defendants had pleaded, an affidavit in support of their motion was required under Summary Judgment Rule 1 (b), and this affidavit is also insufficient under *Fletcher v. Flournoy, supra.*

After the defendants had pleaded to the declaration and had filed their answers to the motion for summary judgment, the plaintiffs proceeded to take the defendants' depositions. Their use is permissible in connection with a motion for summary judgment under Summary Judgment Rule 2. The plaintiffs did not thereafter file any new motion for summary judgment, nor does any renewal of the original motion appear to have been made; and we may assume that, in this case, no such action would have been necessary if their original motion had been sufficient. *Frush v. Brooks,* 204 Md. 315, 104 A. 2d 624.

The defendants do not appear to have challenged the sufficiency of the plaintiffs' motion in the Circuit Court, and it was evidently treated by that Court as being sufficient. It appears that the case was decided by the Circuit Court on the plaintiffs' motion and the defendants' depositions. If the plaintiffs had not filed their motion with the declaration and had waited to do so until after the defendants had pleaded and their depositions had been taken and filed, an affidavit in support of a motion by the plaintiffs for summary judgment might not have been required, and the Circuit Court disposed of the case as if this had been the situation. We

shall do likewise. Cf. *Hamburger v. Standard Lime and Stone Co.,* 198 Md. 336, 84 A. 2d 74. On that basis, the principal question is whether or not the depositions are sufficient to support a summary judgment for the plaintiffs.

In their depositions, each of the defendants denied having made any purchases as individuals of materials from the Friel Lumber Company, except some small items which Mrs. White had purchased and had paid for in cash. Mr. White testified that, with those exceptions, all of the purchases were made by the Corporation.

Mrs. White's testimony indicated almost complete ignorance as to whether or not the materials had been purchased by or on behalf of the Corporation. She testified as to the respective numbers of shares of stock of the Corporation owned by herself, her husband and their son, as to when the Corporation was organized, as to who were its directors and officers, and with regard to corporate meetings. Though she was the Secretary, she seems to have been such in name only. She did not keep the minutes. She said there were no resolutions relating to the building and Mr. White's testimony supported hers on this matter. In reply to a question whether she was familiar with the contract business carried on by the Corporation, she answered that she "was familiar to the point of giving money to it and paying bills, that's all." She also testified that she was away in Florida while a "block building" which was to be used for the Corporation's engineering business was being built, that she didn't know it was being built until she came home, that her husband had said that he "was going to have to build a building to use," and that she supposed it was to be on the farm. She said that she did not know how it came to be built before she and her husband acquired title to the farm, and she denied knowledge that her husband was going to buy materials from the Friel Lumber Company to construct the engineering building and denied ever having gone to the Friel place of business with her husband when he was ordering materials. She admitted knowing that he had been buying all of his lumber from Friel "ever since we had been in

business." She also testified that all bills received from the Friel Lumber Company were directed to the E. J. White Engineering Corporation and that she was never billed until this suit was docketed.

Mr. White's testimony showed that he had ordered materials from the plaintiffs and that the account was in the name of the Corporation. He also testified that as a result of consulting his accountant he had decided to build the engineering building himself on his land [title to which was, however, placed in the names of himself and his wife as tenants by the entireties], and that he would rent it to the Corporation.

He was questioned about a bill of sale dated April 18, 1955, which was not offered in evidence, but was apparently executed by himself and Mrs. White to the Friel Lumber Company covering equipment, including machinery and a crane, but not covering all of his property. The bill of sale was executed in connection with White's borrowing some money, as he had done before. The purpose at that time was to meet a payroll. What the payroll was for is not clear, but this transaction occurred more than a year after the E. J. White Engineering Corporation had gone into receivership and about two and one-half to three years after the purchase of most of the materials involved in this suit. In April, 1955, White said that "We owed him [Friel] $6,000." He further testified that in seventeen days he paid off $1,700 "and shortly after that I had his bill down to $2,600." The $1,700 was raised by Mr. and Mrs. White borrowing money on a mortgage on their home in Salisbury.

It seems extraordinary that six months after the plaintiffs had brought this suit against the defendants individually on sales which had previously been charged to the Corporation, three months after the defendants had denied liability for sales made in the name of the Corporation and fifteen months after the Corporation had gone into receivership, the parties to this suit were dealing with each other under the old corporate account. If we were concerned with a claim growing out of the April, 1955, transaction, this evidence would be very persuasive as to the individual interests of the Whites

at that time; but it seems of little probative force with regard to transactions two and one-half years earlier when the Corporation was still apparently operating and before it had gone into receivership.

If this case were before us on a finding by the Court sitting without a jury, after trial, we should have a different question from that which is presented on this appeal from the granting of a motion for summary judgment. The question before us is analogous to the propriety of granting a directed verdict for the plaintiff on admitted facts. 41 *Am. Jur., Pleading,* § 342, page 525.

The learned and able trial judge in substance took the view not only that the inference could be drawn from the defendants' testimony that the Corporation was their agent in making the purchases, but that there could be no substantial question as to the correctness of this inference. We do not agree with this view.

We do agree with his statement that "it is difficult to determine from the depositions with any degree of certainty whether the husband was acting for himself or for the corporation. But it is quite clear that the husband did not act as agent for the wife, so that if she is to be liable for the materials furnished it must appear that the corporation was her agent either expressly or inferentially." If we apply these statements to the undisputed fact that whatever orders for materials were given, were given by the husband in either his individual capacity or in his capacity as president of the Corporation, the uncertainty of the wife's liability becomes clear. If the husband were acting for himself and neither as her agent nor as agent for the Corporation, she is not bound; and the trial judge himself appears to have been unable to determine that question.

It is perfectly true that the Corporation could have acted as agent for both the husband and the wife and that an agency might be inferred. *Abuc Trading Corporation v. Jennings,* 151 Md. 392, 135 A. 166. Ordinarily, however, such a question is one for determination by the jury. See *Houston v. Monumental Radio, Inc.,* 158 Md. 292, 148 A. 536,

in which a question arose as to whether one Swartwout, who was both the majority stockholder and the president of a corporation and was alleged to have deluded the plaintiff into rendering valuable services in the operation of a radio station for much less than their real value, was acting for himself or for the corporation. At 158 Md. 309, this Court said: "In view of his position as president and majority stockholder of the company, it cannot be said, as a matter of law, that in doing that Swartwout acted for himself or for the corporation or for both. Whether he acted in the one capacity or the other was essentially a jury question, to be determined in connection with the other facts and circumstances of the case." The husband is not the agent of the wife merely because of the husband-wife relationship. *Powers v. Malach*, 199 Md. 110, 85 A. 2d 478. Nor will a course of dealing, even though long continued, necessarily establish such an agency. *Twilley v. Bromley*, 192 Md. 465, 64 A. 2d 553. See also the very recent case of *Bukowitz v. Md. Lumber Co.*, 210 Md. 148, 122 A. 2d 486, where service of a notice relating to a mechanic's lien made on the husband was held not sufficient to bind the wife.

We may add that we find no basis in the depositions or elsewhere for the application of the doctrine of agency by estoppel, since there has been no action by the alleged principals which might have misled the plaintiffs into believing that a non-existent agency did exist. See *Abuc Trading Corp. v. Jennings, supra.*

There is no question that the Corporation appears to have been dealt with in a rather cavalier fashion by Mr. White, and there is no doubt that Mrs. White was very little informed or aware of its affairs. There is, however, nothing to show that it was intentionally used for any fraudulent purpose, and this view seems to have been shared by the trial judge.

The trial judge placed much emphasis upon the supposed *ultra vires* character of an arrangement under which the Corporation would have constructed a building on land owned by others, and largely because of the irregularities which

such an arrangement would involve reached the conclusion that the Corporation was necessarily the agent of both the husband and the wife. Yet if the husband's testimony with regard to erecting the building himself and then leasing it to the Corporation is taken most strongly against him, it would show that he was using the Corporation as his own agent; but that does not prove that it was also the agent for the wife. Since neither the charter of the Corporation nor the exact terms of any agreement or understanding between it and Mr. White are shown, it is difficult to state with certainty that its actions were *ultra vires*. It would apparently have been perfectly lawful for the Corporation to act as agent for Mr. White or for it to have agreed to construct the building for him as a contractor. Also, there are instances in which a lessee corporation under a long term lease may properly construct a building on land owned by the lessor, though it is not shown that such a plan was in contemplation here.

It is essential to the entry of a summary judgment under our Rule 4 that there be no genuine dispute as to any material fact and that the moving party be entitled to judgment as a matter of law. As this Court has pointed out (as in *Fletcher v. Flournoy* and *Frush v. Brooks,* above cited) our Summary Judgment Rules are largely derived from the Federal Rules of Civil Procedure and decisions under those Rules are especially persuasive as to the meaning of the Maryland Rules. Under the Federal Rules, it has been held that where different inferences may be drawn from undisputed facts, the party against whom the inferences are sought to be drawn is entitled to the inferences more favorable to his contentions. *Ramsouer v. Midland Valley R. Co.,* 135 F. 2d 101 (8th Cir. 1943); *Blakeney v. United Insurance Co.,* 87 A. 2d 532 (D. C. Mun. App. 1952). See also *Barron & Holtzoff, Federal Practice and Procedure,* Sec. 1325. We think that the Reporter's notes to our Summary Judgment Rules (1947 Supp. to the 1939 Ed. of the Annotated Code, p. 2114), which are quoted in *Frush v. Brooks,* at 204 Md. 321, support this view. The notes state: "The court does not, of

course, attempt to decide any issue of fact or of credibility, but only whether such issues exist. If the affidavits or other evidence show a genuine conflict, the court must deny the motion. Thus the proposed procedure is not a substitute for a trial, but only a hearing to decide whether a trial is necessary." We think that a trial is necessary to resolve uncertainties on the record in the instant case. Accordingly, the judgment must be reversed and the case remanded.

> *Judgment reversed, with costs of this appeal to the appellants, and case remanded.*